AMERICAN TRUST COMPANY, EXECUTOR AND TRUSTEE UNDER THE LAST WILL AND TESTAMENT AND ESTATE OF THOMAS LEE WILSON, SR., v. CATAWBA SALES & PROCESSING COMPANY, A CORPORATION.

(Filed 30 June, 1955.)

**1. Pleadings § 15—**

The allegations of the complaint will be taken as true upon demurrer.

**2. Contracts § 8—**

Separate contracts executed in the same transaction for a common purpose, even though the parties are not the same provided the several contracts are known to all of them, may be construed together to ascertain the intent of the parties. This rule may not be applied so as to avoid an essential part of one of the contracts, and does not import that the provisions of one contract may be incorporated bodily in another.

**3. Contracts § 9½—Contracts held for benefit of third person, construing the agreements together to effectuate intent of parties.**

The person in charge of the management and sales of "A" corporation, and who controlled a majority of its stock, upon impairment of health, desired to provide good management and adequate sales service for the corporation. He sold half his stock to "B" corporation, and "A" corporation executed an agreement with "B" corporation, giving it exclusive selling rights of the entire production of "A" corporation at a stipulated commission, with the provision that the contract should continue so long as "B" corporation and the individual stockholder, his executors and administrators, etc., should own a majority of the stock of "A" corporation. On the same date the individual stockholder and "B" corporation entered into an agreement for "B" corporation to vote the stock of the individual

and to manage and control "A" corporation, with further provision that neither "B" corporation nor the individual should sell or dispose of his stock for a period of six years, subject to exceptions not material in this action.    On the same date a third contract was entered into by the individual stockholder and "B" corporation, under which "B" corporation was to pay to the individual, his executors and assigns, 5 per cent of the commissions paid to "B" corporation by "A" corporation, with provision that this contract should remain in effect so long as the first agreement should be in force.    The officers and directors of both "A" and "B" corporations had full knowledge of all three agreements.    *Held:* Construing the agreements together, the individual stockholder, and upon his death his estate, was a direct beneficiary of the contract between "A" and "B" corporations, which construction is strengthened by the interpretation given the three contracts by the parties themselves.

**4. Contracts § 8—**

The interpretation given to a contract by the parties themselves before controversy is a material aid in ascertaining the intention of the parties.

**5. Contracts § 19—**

A third party may sue to enforce a valid contract made for his benefit even though he is a stranger to the contract and to the consideration, and it is not necessary that he be the sole beneficiary, provided the contract was entered into for his direct benefit and the benefit to him is not merely incidental to the agreement.

**6. Contracts § 9½—**

Where a contract is made for the direct benefit of a third person, who has accepted and acted upon it, such contract may not be materially modified or changed by the other parties without such third party's consent.

**7. Contracts § 21—**

Where the complaint alleges that a contract was executed for the benefit of a third party, his executors and assigns, that the contract had been accepted and acted upon by the third party beneficiary, that the other parties had attempted to cancel the agreement contrary to its terms and without the consent of the third party beneficiary, and seeks an accounting for sums due under the agreement, the complaint *is held* sufficient to state a cause of action in favor of the third party beneficiary, and demurrer to the complaint is properly overruled.

**8. Same—**

Plaintiff alleged a contract under which it was entitled to 5 per cent of the commissions received by defendant under a contract with a third party.    *Held:* Demurrer on the ground of want of allegation that the third party had paid defendant any sum is bad when the complaint alleges that the failure of defendant to receive payments due under the contract resulted from defendant's wrongful attempt to cancel same.

**9. Pleadings § 17a—**

A written demurrer must distinctly specify the ground of objection in order to present the question for decision.

**10. Contracts § 21: Election of Remedies § 5—**

A party may state in the alternative a cause of action to recover sums due under a contract with a cause of action for damages for breach of the contract if the contract had been canceled in violation of its terms.

DENNY, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Clarkson, J.,* January Regular Civil Term 1955 of GASTON.

Civil action heard upon a written demurrer. The complaint alleges two causes of action: One, for the recovery of moneys due under three contracts; Two, if the contract between Bowling Green Spinning Company and the defendant was validly cancelled, for the recovery of damages for breach of the agreements between the defendant and Thomas Lee Wilson, Sr. The ground of the demurrer is that the complaint does not state facts sufficient to constitute a cause of action as to either cause of action.

From a judgment overruling the demurrer as to both causes of action, the defendant appeals, assigning error.

*R. Gregg Cherry, Helms & Mulliss, Fred B. Helms and John D. Hicks for Plaintiff, Appellee.*

*Pierce & Blakeney for Defendant, Appellant.*

PARKER, J. The complaint alleges two causes of action.

### FIRST CAUSE OF ACTION.

This is a summary of the material allegations of the first cause of action—the numbering of the paragraphs is ours:

One. The American Trust Company, the plaintiff and hereafter called the Trust Company, brought this action as Executor and Trustee under the Last Will and Testament of Thomas Lee Wilson, Sr., who died on 30 March 1951. This action is for the recovery of monies due under three agreements involving three parties. One, the late Thomas Lee Wilson, Sr. (hereafter called Wilson), of Gastonia. Two, Catawba Sales & Processing Co. (hereafter called Catawba), a North Carolina corporation with its principal place of business in Gastonia. Three, Bowling Green Spinning Co. (hereafter called Bowling Green), a South Carolina corporation having its principal place of business at Bowling Green, South Carolina.

Two. Bowling Green was engaged in the manufacture and sale of textile goods. Prior to 1950 Wilson had been in charge of the management and sales of Bowling Green, and through his efforts he had developed it from an insolvent condition to a profitable business in 1950.

In 1950 Wilson's health became impaired. At the time Bowling Green had 645 shares of capital stock outstanding, and Wilson and his family owned 324 of these shares.

Three. After Wilson's health became impaired, he desired to provide good management and adequate sales service for Bowling Green. To effectuate his desire he sold 162 shares of the capital stock of Bowling Green to Catawba, and the three contracts set forth below were executed and delivered simultaneously in Gaston County:

### FIRST CONTRACT.

This contract, hereafter called the "Sales Agreement," was entered into on 22 August 1950 by and between Bowling Green, party of the first part, and Catawba, party of the second part. It gave Catawba the exclusive selling rights of the entire production of Bowling Green on a 5% commission, to be paid to Catawba, whether the goods were sold by Catawba or not—the agreement being that Catawba will be paid a 5% commission on the entire sales of Bowling Green. This contract further provides:

"(3) This contract shall become effective August 22, 1950; and shall continue in effect so long as Catawba Sales & Processing Company and Thomas L. Wilson, Sr., or his executors, administrators, donees, legatees, widow, next of kin or other persons, firms, or corporations claiming under or through the said Thomas L. Wilson, Sr., own the majority of the outstanding stock in Bowling Green Spinning Company."

### SECOND CONTRACT.

This contract, hereafter called the "Management and Voting Control Agreement," was entered into on 22 August 1950, by and between Catawba, party of the first part, and Wilson, party of the second part. After stating that Bowling Green has 645 shares of capital stock outstanding, and that Wilson and Catawba own each 162 shares of this stock, it provides as follows:

"(1) That Catawba Sales & Processing Company through its officers and agents shall manage and operate the mill, plant and business of Bowling Green Spinning Company, for such time as the said Catawba Sales & Processing Company and Thomas L. Wilson, Sr., or his executors, administrators, legatees, next of kin, widow or donees, own the majority of the outstanding stock in Bowling Green Spinning Company.

"(2) During the life of Thomas L. Wilson, Sr., Catawba Sales & Processing Company shall be, and it hereby is, given the right to vote the 162 shares of stock in the aforesaid corporation owned by Thomas L. Wilson, Sr.; and upon the death of the said Thomas L. Wilson, Sr.,

the said Catawba Sales & Processing Company shall continue to vote the said 162 shares owned by the said Thomas L. Wilson, Sr. at the time of his death, and continue to operate and manage the aforesaid plant, mill and business of Bowling Green Spinning Company, so long as the said 162 shares of stock in the said corporation is owned by the executors, administrators, legatees, next of kin, widow or donees of the said Thomas L. Wilson, Sr.

"(3) Neither the said Catawba Sales & Processing Company as the owner of the aforesaid 162 shares of stock nor Thomas L. Wilson, Sr. as the owner of the aforesaid 162 shares of stock, nor any person, firm or corporation claiming under, through or by either of the said two parties to be the owner of any portion of the aforesaid stock, shall sell or otherwise dispose of the same for a period of six (6) years from date. In the event that Catawba Sales & Processing Company should, after six (6) years from date, desire to sell the aforesaid 162 shares of stock in Bowling Green Spinning Company, or in the event that the said Thomas L. Wilson, Sr., his executors, administrators, trustee, legatees, next of kin, widow or donees, after six (6) years from date should desire to sell the 162 shares of the said stock in the said corporation now owned by the said Thomas L. Wilson, Sr., then such party or parties desiring to sell shall offer the said stock to the other party for such price as the seller or sellers may be willing to take. In the event that the offer to sell the said stock is not accepted by the other party, then neither party to this agreement nor any persons, firms or corporations claiming through or under them shall have the right to sell the said stock or any part of it unless the purchaser shall be willing to purchase the entire 324 shares hereinabove referred to at a price satisfactory and agreeable to all of the owners and holders of the said 324 shares of stock. The certificates of stock issued by Bowling Green Spinning Company representing the 324 shares of stock hereinabove referred to, shall have a notation placed upon them to the effect that the same are subject to the provisions of this agreement, which shall remain on file among the records of Catawba Sales & Processing Company at Gastonia, North Carolina, or if the party of the second part so desires, instead of placing the notation on so many of the said stock certificates as evidence the 162 shares of stock owned by the said Wilson, he can place the said stock certificates in escrow with D. R. LaFar, Jr. to guarantee and assure the faithful performance of this agreement."

### THIRD CONTRACT.

This contract was entered into on 22 August 1950, by and between Catawba, party of the first part, and Wilson, party of the second part. These are its provisions:

"WITNESSETH, THAT WHEREAS, Catawba Sales & Processing Company has a contract with Bowling Green Spinning Company, a corporation of Bowling Green, South Carolina, dated August 22, 1950, by the terms of which the said Bowling Green Spinning Company has given to the Catawba Sales & Processing Company the exclusive selling of the entire production of the plant of Bowling Green Spinning Company on a straight five (5%) per cent commission, and the Catawba Sales & Processing Company has agreed to devote whatever time is necessary to selling the said production of Bowling Green Spinning Company; and

"WHEREAS, Thomas L. Wilson, Sr. has agreed to advise the Catawba Sales & Processing Company in connection with its selling efforts and to assist it in establishing outputs of a satisfactory and permanent character for the production of the said Bowling Green Spinning Company;

"Now, THEREFORE, for and in consideration of the mutual covenants herein contained, IT IS AGREED:

"(1) That Catawba Sales & Processing Company will pay to Thomas L. Wilson, Sr. thirty (30%) per cent of all such selling commissions as may be paid by Bowling Green Spinning Company to the Catawba Sales & Processing Company.

"(2) Thomas L. Wilson, Sr. agrees to advise the said Catawba Sales & Processing Company and to assist it in an advisory capacity in selling the production of the aforesaid Bowling Green Spinning Company.

"(3) This contract shall become effective August 22, 1950, and shall remain in effect so long as the aforesaid contract between Bowling Green Spinning Company and Catawba Sales & Processing Company remains in full force and effect. However, should the said Thomas L. Wilson, Sr. die while the aforesaid contract between Bowling Green Spinning Company and Catawba Sales & Processing Company is still effective, then so long as the said contract is in full force and effect, the aforesaid thirty (30%) per cent of the aforesaid commissions to be paid to Catawba Sales & Processing Company, shall be paid to the executor or administrator of the estate of Thomas L. Wilson, Sr., or to such other person as may be designated by the said Thomas L. Wilson, Sr. in his last will and testament. However, should the said contract between Bowling Green Spinning Company and Catawba Sales & Processing Company at any time be cancelled, then this contract shall no longer be effective. Likewise, should Catawba Sales & Processing Company at any time acquire a majority of the outstanding stock of Bowling Green Spinning Company, by purchasing the one hundred sixty-two (162) shares from Thomas L. Wilson, Sr. or his estate or legal representatives, and the Catawba Sales & Processing Company should thereafter desire to cancel this contract, then the Catawba Sales & Processing Company shall be at full liberty so to do."

Four. Since 22 August 1950 the officers and directors of Bowling Green and Catawba have had full knowledge of the three agreements set forth above. Since 1949, and now, D. R. LaFar, Jr. has been President and Treasurer, Dan S. LaFar, Vice-President and Secretary, and Robert E. Caldwell, Assistant Secretary and Assistant Treasurer of Catawba. Since Wilson's death these men have held the identical offices with Bowling Green that they hold with Catawba.

Five. Since 22 August 1950, and up to 31 October 1953, Catawba handled the sales of the entire production of Bowling Green in accordance with the Sales Agreement, and during said time Bowling Green paid 5% commissions to Catawba as agreed. During the same period, Catawba, according to its contract with Wilson, paid to Wilson, and to his estate, after his death, 30% of the commissions received by it from Bowling Green—the payments to Wilson, and his estate, amounting to $52,457.22.

Six. During September 1953 the officers and directors of Catawba, who were likewise the officers and directors of Bowling Green, attempted to cancel, or purported to cancel, the Sales Agreement between them, in pursuance of the plan of Catawba to relieve itself of its obligation to pay the estate of Wilson commissions according to its contract with him.

Seven. Neither the plaintiff, nor the legatees and devisees under the will of Wilson, nor any of the beneficiaries under the trusts erected by his will have consented to, ratified or approved the attempted, or purported cancellation of the Sales Agreement between Catawba and Bowling Green.

Eight. At all times since 22 August 1950 Wilson, or his estate, and Catawba have owned, and still own, a majority of the outstanding capital stock of Bowling Green, and that the attempted, or purported cancellation of the Sales Agreement between Catawba and Bowling Green was invalid and void.

Nine. That under the three contracts set forth above, plaintiff is entitled to recover from Catawba 30% of 5% of the commissions provided by the Sales Agreement between Bowling Green and Catawba commencing with November 1953 and continuing so long as said agreements remain in force, and that plaintiff is entitled to recover for at least a minimum of six years 30% of such commissions from Catawba.

Ten. That plaintiff is entitled to an accounting of all sales of the entire production of Bowling Green by Catawba, or any one else, up to and including July 1954, and for each month thereafter, unless and until the contract between Catawba and Wilson is legally cancelled, as therein provided.

Wherefore, the plaintiff prays for an accounting, and for the recovery of money from Catawba in the amount shown by the accounting due it, according to the contract between Catawba and Wilson.

## SECOND CAUSE OF ACTION.

In the second cause of action the first 34 paragraphs of the first cause of action are repleaded. The substance of the allegations of the second cause of action is this: If the Sales Agreement between Bowling Green and Catawba has been validly cancelled by them, then Catawba in agreeing to the cancellation unlawfully breached its contract with Wilson, for which breach it is responsible in damages to plaintiff.

Accepting the allegations of the complaint to be true, as we are required to do upon a demurrer, *McKinley v. Hinnant, ante,* 245, 87 S.E. 2d 568, these facts appear: Prior to 1950 Wilson had been in charge of the management and sales of Bowling Green, and through his efforts he had developed it from an insolvent condition to a profitable business in 1950. In 1950 his health became impaired. At that time he and his family owned a majority of the outstanding capital stock of Bowling Green. After his health became impaired, he desired to provide good management and adequate sales service for Bowling Green. To effectuate his desire he sold one-half of his controlling stock in Bowling Green to Catawba, and the three contracts were executed and delivered simultaneously in Gaston County.

We have said that "when two or more papers are executed by the same parties at the same time, or at different times, and show on their face that each was executed to carry out the common intent, they should be construed together." *Perry v. Surety Co.,* 190 N.C. 284, 129 S.E. 721.

The general rule is thus stated in 12 Am. Jur., Contracts, p. 782: "In the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument." Numerous cases are cited in support of the text, including *Lewis v. Nunn,* 180 N.C. 159, 104 S.E. 470.

*Ruffin, C. J.,* said in *Howell v. Howell,* 29 N.C. 491: "Where contracts are put into several instruments, each of which has a sensible meaning and may have a full operation, by itself, it would be a hazardous assumption to put them together for the purpose of making them mean, as one, differently from what they could in this separate state; and, certainly, the court cannot do such violence to the intention of the parties, and the language in which they are expressed, as to consolidate separate instruments when the effect of doing so would be to avoid an essential part of the contract." This is quoted verbatim in 12 Am. Jur., Contracts, Sec. 246.

In *Peterson v. Miller Rubber Co. of New York,* 24 Fed. 2d 59, 62, the Court said: "A contract may be contained in several instruments. These, if made at the same time, in relation to the same subject matter,

may be read together as one instrument, and the recitals in one may be explained or limited by reference to the other. This rule obtains even when the parties are not the same, if the several contracts were known to all the parties and were delivered at the same time to accomplish an agreed purpose." See also 17 C.J.S., Contracts, p. 716.

This principle is a rule of construction to give effect to the intent of the parties: the provisions of one contract are not thereby imported bodily into another. *Huyler's v. Ritz-Carlton Restaurant & Hotel Co. of Atlantic City,* 1 Fed. 2d 491. "The heart of a contract is the intention of the parties." *Jones v. Realty Co.,* 226 N.C. 303, 37 S.E. 2d 906.

Reading these three contracts together these facts appear: Catawba and Wilson owned a majority of the outstanding capital stock of Bowling Green, and Catawba and Wilson entered into the Management and Voting Control Agreement, which provides that Catawba shall manage the business of Bowling Green for such time as Catawba and Wilson, or his executors, administrators, etc., own the majority of the outstanding capital stock of Bowling Green, and that during such time Catawba shall vote the Wilson stock. That neither shall sell their stock for 6 years. Then the Sales Agreement between Bowling Green and Catawba gives Catawba the exclusive selling of the entire production of Bowling Green on a commission of 5%, and provides that this contract of sales shall continue in effect so long as Catawba and Wilson, or his executors, administrators, etc., own the majority of the outstanding capital stock of Bowling Green. Then the Third Contract, after reciting the terms of the Sales Agreement between Bowling Green and Catawba, provides that Catawba shall pay to Wilson, or his executors, administrators, etc., 30% of all such selling commissions as may be paid by Bowling Green to Catawba, so long as the Sales Agreement between Bowling Green and Catawba remains in effect. This contract provides that should the Sales Contract be cancelled, then this contract shall be cancelled. Reading these three contracts together, it is our opinion that their true intent and meaning are that Wilson was a direct beneficiary of the Sales Agreement between Bowling Green and Catawba. It is true that he was not a party or privy to it. However, he was a party to the other two contracts. Such interpretation violates no essential part of the three contracts.

That Wilson was a direct beneficiary of the Sales Agreement between Bowling Green and Catawba, was the practical interpretation of the three contracts given by the parties to them, while engaged in their performance before any controversy had arisen, because the complaint alleges that since 22 August 1950 and up to 31 October 1953 Catawba handled the sales of the entire production of Bowling Green, in accordance with the Sales Agreement, and during said time Bowling Green

paid 5% commissions on the sales of its production to Catawba, and Catawba paid 30% of these 5% commissions to Wilson, or his estate, as agreed in the Third Contract. Such a construction of the contracts by the parties is one of the best indications of their true intent and meaning, for it is to be presumed that the parties to contracts know best what was meant by their terms, and are least liable to be mistaken as to their purpose and intent, and courts adopting and enforcing such construction are not likely to commit serious error. *Cole v. Fibre Co.,* 200 N.C. 484, 157 S.E. 857; *Holland v. Dulin,* 206 N.C. 211, 173 S.E. 310; *Manhattan Life Ins. Co. v. Wright,* 126 Fed. 82; *Hull Co. v. Westerfield,* 107 Neb. 705, 186 N.W. 992, 29 A.L.R. 105.

This Court said in *Canestrino v. Powell,* 231 N.C. 190, 56 S.E. 2d 566, in an opinion written by *Ervin, J.,* where 16 of our cases are cited to support the statement: "The rule is well established in this jurisdiction that a third person may sue to enforce a binding contract or promise made for his benefit even though he is a stranger both to the contract and to the consideration." To the same effect: *Brown v. Construction Co.,* 236 N.C. 462, 73 S.E. 2d 147. This is the majority American Rule. Anno. 81 A.L.R. 1279. We have not adopted the principle that he must be the sole beneficiary. *James v. Dry Cleaning Co.,* 208 N.C. 412, 181 S.E. 341; *Supply Co. v. Lumber Co.,* 160 N.C. 428, 76 S.E. 273; *Gastonia v. Engineering Co.,* 131 N.C. 363, 42 S.E. 858; *Gorrell v. Water Supply Co.,* 124 N.C. 328, 32 S.E. 720. If the contract was not made for the benefit of the third party, he has no cause of action upon the contract to enforce it, or sue for its breach. *Land Co. v. Realty Co.,* 207 N.C. 453, 177 S.E. 335.

Contracts for the benefit of third persons have been a prolific source of judicial and academic discussion. Not every such contract made by one with another, the performance of which would be of benefit to a third person, gives a right of action to such third person. Whether such person can enforce the contract depends on the facts and circumstances of the particular case. For a discussion of limitation to the rule stated by various courts, see 17 C.J.S., Contracts, p. 1125 *et seq.*

The United States Supreme Court said in *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 72 L. Ed. 290: " 'Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must at least show that it was intended for his direct benefit.' *German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 57 L. Ed. 195, 199, 42 L.R.A. (NS) 1000." See also: Anno. 81 A.L.R. 1286-1288.

"A third person for whose direct benefit a contract was entered into may sue for breach thereof; but if the benefit is only incidental, he may not." 12 Am. Jur., Contracts, Section 281.

Reading the three contracts together it is clear that the provision in the Sales Agreement that it shall continue in effect so long as Catawba and Wilson, or his executors, administrators, etc., own a majority of the outstanding capital stock of Bowling Green, was inserted for the direct benefit of Wilson, or his executors, administrators, etc., and that benefits have been accepted by them, because under these contracts they received from Catawba $52,457.22 from 22 August 1950 to 31 October 1953.

That a contract made for the direct benefit of a third person cannot be materially modified or changed by the other parties thereto without the third party's consent, where the contract has been accepted and acted upon by him, as in the instant case, seems to be the law. *Liner v. Traveler's Ins. Co.*, 50 Ga. App. 643, 180 S.E. 383; *Richardson v. Short*, (Iowa) 202 N.W. 836, 838; *Hamill v. Maryland Casualty Co.*, 209 F. 2d 338; *Pliley v. Phifer*, 1 Ill. App. 2d 398, 117 N.E. 2d 678; *Rhodes v. Rhodes*, Ky., 266 S.W. 2d 790; *Camden Trust Co. v. Haldeman*, 133 N. J. Eq. 427, 33 A. 2d 611, affirmed 40 A. 2d 601, 136 N. J. Eq. 261; Annos.: 81 A.L.R. 1294; 53 A.L.R. 181-182; 17 C.J.S., Contracts, Sec. 390.

It is said in Anno. 53 A.L.R. 181: "It is well settled that, after acceptance or action on a contract by a third person for whose benefit it was made, the original parties may not, without the consent of such third person, rescind the contract by mutual agreement, so as to deprive him of its benefits."

The defendant demurs to each cause of action on the grounds that neither states facts sufficient to constitute a cause of action. These are the grounds of the demurrer as to the First Cause of Action:

First. That it appears from the complaint, and the contracts attached thereto and made parts thereof, that Catawba agreed to pay Wilson, or his estate, 30% of such commissions as might be paid to Catawba by Bowling Green; that the contract between Catawba and Wilson provided that it should remain in effect so long as the contract between Bowling Green and Catawba remains in effect, and that the contract between Catawba and Wilson further provided, however, should the contract between Bowling Green and Catawba be cancelled, then their contract shall no longer be effective; that the contract between Bowling Green and Catawba was cancelled in September 1953, and Catawba has paid Wilson, or his estate, 30% of all commissions received by it through October 1953, and therefore plaintiff has stated no cause of action. This contention ignores the provision of the Sales Agreement between Bowling Green and Catawba that this Sales Agreement shall continue in effect so long as Catawba and Wilson, or his executors, administrators, etc., own the majority of the outstanding

capital stock of Bowling Green, and that the complaint alleges they still own a majority of such stock. Since Wilson, or his executors, administrators, etc., are direct beneficiaries of this Sales Agreement, reading the three contracts together to carry out their intent and meaning, Catawba and Bowling Green could not cancel it without the consent of Wilson, or his executors, administrators, etc., and the complaint alleges they have never consented to the cancellation.

Second. That the complaint has not alleged that defendant has been paid one cent for commissions since October 1953. If Catawba has received no commissions since October 1953, because it has cancelled the Sales Agreement between Bowling Green and itself without the consent of Wilson, or his executors, administrators, etc., this ground of the demurrer as to plaintiff's second cause of action is bad.

Third. The substance of this ground is that there is nothing in the contract between Wilson and Catawba to prevent Catawba from cancelling the Sales Agreement between Bowling Green and itself, that the contract between Catawba and Bowling Green has been cancelled, and that the contract between Catawba and Wilson provides that should the Sales Agreement between the two corporations be cancelled, then the contract between Catawba and Wilson, or his estate, shall no longer be effective.

Fourth. That it appears from the complaint that whatever rights, if any, the plaintiff has against this defendant in connection with the monies herein sued for, are bottomed upon the contract between Catawba and Wilson, and upon the facts alleged, the complaint negatives the plaintiff's right to recover.

What we have said under the first ground of the demurrer answers the third and fourth grounds of the demurrer.

The grounds of the demurrer as to the Second Cause of Action are substantially the same as those to the First Cause of Action.

The defendant contends in its brief that the Management and Voting Control Agreement between Catawba and Wilson is invalid. Defendant's demurrer does not specify this as a ground of objection. G.S. 1-128 states: "The demurrer must distinctly specify the grounds of objection to the complaint, or it may be disregarded." This Court said in *Love v. Comrs.*, 64 N.C. 706: ". . . Every demurrer is special, and must distinctly specify the ground of objection to the complaint. It is so easy to specify the ground of objection that the Court is not disposed to relax the rule." Defendant has not presented the alleged invalidity of the Management and Voting Control Agreement for decision.

Plaintiff has stated two good causes of action in the alternative in order to meet different aspects of the evidence. First, plaintiff has alleged a good cause of action to recover monies from Catawba due

under existing contracts. Second, plaintiff has alleged a good cause of action in the alternative to recover damages for breach of contracts by Catawba, if the Sales Agreement between Bowling Green and Catawba has been cancelled by the parties thereto without the consent of Wilson, or his executors, administrators, etc., the Sales Agreement having been accepted and acted upon by them.

The judgment of the lower court overruling the demurrer as to both causes of action is

Affirmed.

DENNY, J., took no part in the consideration or decision of this case.