THERMAL DESIGN, INC., Plaintiff v. M&M BUILDERS, INC. and
THE HANOVER INSURANCE COMPANY, Defendants

No. COA09-1409

(Filed 7 September 2010)

**1. Contracts— breach of contract—unjust enrichment—written agreement—no oral modification—summary judgment proper**

The trial court did not err in granting summary judgment in favor of plaintiff on its breach of contract and unjust enrichment claims arising out of a dispute over a custom- manufactured roofing and insulation system. The parties were bound by the original terms of a written purchase order and credit agreement, and no substitute oral agreement had been reached. Moreover, defendant M&M Builders, Inc. breached the terms of the agreement by failing to pay for the custom roof.

**2. Contracts— breach of contract—unjust enrichment—mitigation of damages—summary judgment proper**

The trial court did not err in granting summary judgment in favor of plaintiff on its breach of contract and unjust enrichment claims arising out of a dispute over a custom-manufactured roofing and insulation system as there was no genuine issue of material fact concerning whether plaintiff took reasonable steps to mitigate its damages.

Appeal by defendants from judgment entered 9 July 2009 by Judge Catherine C. Eagles in Guilford County Superior Court. Heard in the Court of Appeals 24 March 2010.

*Hill Evans Jordan & Beatty, PLLC, by Benjamin D. Ridings, for defendant appellants.*

*Smith Moore Leatherwood, LLP, by James R. Faucher and Elizabeth Brooks Scherer, for plaintiff appellee.*

HUNTER, JR., Robert N., Judge.

**THERMAL DESIGN, INC. v. M&M BUILDERS, INC.**

[207 N.C. App. 79 (2010)]

The trial court granted summary judgment in favor of Thermal Design, Inc. ("plaintiff"), on its claim for breach of contract and unjust enrichment against M&M Builders, Inc. ("M&M"), and the Hanover Insurance Company (collectively "defendants"). In its complaint, plaintiff alleged that M&M wrongfully failed to pay the purchase price for a custom-manufactured roofing and insulation system (the "Custom Roof") per the parties' written agreement. Defendants appeal the judgment, and argue that the trial court erred in granting plaintiff's summary judgment motion because genuine issues of fact exist as to: (1) whether the parties were bound by the terms and conditions in the initial purchase order and credit agreement at the time of the alleged breach; (2) whether M&M detrimentally relied on plaintiff's oral promise to accept a return of the Custom Roof in exchange for a restocking fee; and (3) whether plaintiff took reasonable steps to mitigate its damages.

After review, we agree with the trial court that the parties were bound by the original terms of the purchase order and credit agreement, and that M&M breached the terms by failing to pay for the Custom Roof. Since defendants have failed to raise a genuine issue of material fact for trial, we affirm the trial court's order.

## I. BACKGROUND

On 7 August 2007, M&M purchased the Custom Roof on credit by executing a purchase order and credit agreement (collectively the "Contract").[1] The Custom Roof was purchased for $21,595.61, and M&M planned to install the Custom Roof in the Allen Jay Recreation Center in High Point, North Carolina, a project which M&M was in the process of constructing at the time. On 30 October 2007, plaintiff and M&M executed a revised purchase order for the Custom Roof, decreasing the size of the order and reducing the price to $18,556.25. The revised purchase order did not alter any terms or conditions in the Contract. In the credit application, the terms stated in part:

> In consideration for receiving credit, the undersigned agrees to all of the terms and conditions stated in this credit contract. The terms and conditions of this credit contract will supercede any contradictory terms stated on purchase orders

---

1. The parties do not dispute that these separate documents together constituted a final expression as to the terms and conditions of the sale of the Custom Roof. Thus, we will construe the terms and conditions of these documents together. *See American Trust Co. v. Catawba Sales & Processing Co.*, 242 N.C. 370, 377, 88 S.E.2d 233, 238 (1955) (" 'When two or more papers are executed by the same parties at the same time, or at different times, and show on their face that each was executed to carry out the common intent, they should be construed together.' ") (citation omitted).

**THERMAL DESIGN, INC. v. M&M BUILDERS, INC.**

[207 N.C. App. 79 (2010)]

or other project documents, as a condition of granting credit. In accordance with the usage of the trade, the acknowledgment of this contract will be construed as a counter offer to any terms and conditions of the Buyer's documentation and will be construed as accepted by the Buyer for all purchases for which credit is used until full payment is made and this contract is specifically revoked in writing. . . . This agreement is a continuing general credit contract and *shall remain in effect and be non-cancellable for any charges and interest incurred under this agreement until they are paid in full. The terms of this agreement shall not be altered except with written authorization of a corporate officer of Thermal Design[,] Inc.*

(Emphasis added.)

The Custom Roof was delivered to the construction site and accepted by M&M in early November 2007. Plaintiff invoiced M&M for the full contract price on 7 November 2007 with payment due in full by 7 December 2007. Following the invoice, M&M sent no payment.

On 17 December 2007, M&M's vice president, Greg Mauldin, contacted plaintiff and spoke with a salesman named Travis Mettenbrink. In the conversation, Mr. Mauldin explained that the steel erection subcontractor working on the Allen Jay Recreation Center project had informed him that "use of the materials delivered by [plaintiff] would require numerous penetrations of the materials by various trades and that a substitute insulation system should be used instead of [plaintiff's]." Mr. Mauldin claimed, after the conversation, that Mr. Mettenbrink said that plaintiff would accept a return of the Custom Roof in exchange for a restocking fee of 35% of the purchase price, $7,500. Mr. Mauldin sent an email to the project's architect the same day confirming the alleged statement by plaintiff that it would accept a return of the Custom Roof for the restocking fee. On 19 December 2007, plaintiff sent M&M a past-due invoice asking for full payment. On 20 December 2007, Mr. Mauldin sent an email to the project's architect informing the architect that a cheaper substitute insulation would be installed on the project instead of the Custom Roof.

On 21 December 2007, Mr. Mauldin spoke again with Mr. Mettenbrink and one of plaintiff's customer service managers, Dean Quinn. During this phone call, Mr. Mauldin claimed that Mr. Mettenbrink and Mr. Quinn said that M&M should "consider making alterations" in order to allow the Custom Roof to be used on the project.

Mr. Mauldin claimed again after the conversation that Mr. Mettenbrink said that plaintiff would accept a return of the Custom Roof for payment of a 35% restocking fee plus the cost of freight. M&M's president and superintendent were present during this phone exchange; however, no corporate officers from plaintiff were also on the phone. Later the same day, M&M ordered a substitute insulation system from Bay Insulation of North Carolina, Inc., for $10,233.39.

At 10:00 p.m. on 21 December 2007, Mr. Mauldin sent a fax to Mr. Mettenbrink stating: "We [at] M&M Builders, Inc.[,] have decided to use another product from a local supplier. You need to make arrangements to pick up your material [at] the site." This communication was the first from M&M stating affirmatively to plaintiff that M&M would actually be returning the Custom Roof. No part of the fax mentioned an oral agreement or a restocking fee.

In recalling the 17 and 21 December 2007 phone calls with Mr. Mauldin, Mr. Mettenbrink later stated in his affidavit:

> 5. On December 21, 2007, I had a telephone conference with representatives of M&M to discuss the Simple Saver Roof System with R30 Insulation, the Simple Saver Wall System with R19 Insulation and related goods that had been delivered to them. At no time during that conversation, nor at any other time, did I agree that [plaintiff] would accept a return of the custom fabricated goods. Moreover, I am not authorized to make an agreement to accept return of the custom fabricated goods, as all changes to credit sale contracts must be in writing and signed by an officer of [plaintiff].

Mr. Quinn similarly denied after the phone call that any agreement had been reached regarding a return of the Custom Roof on any terms.

Over the Christmas and New Year's holiday season, no communication between the parties took place. On 4 January 2008, Mr. Mauldin sent Mr. Mettenbrink another fax:

> We [at] M&M Builders, Inc.[,] did not mean to insult your company in any way. The 12/21/07 fax was sent to your company with back-up per our fax machine. You stated that no trucking would be performed until after the first of the year. Our steel erector worked the week of Christmas and needed material that week. Per conversation w/architect for project e-mail, etc.[,] we were able to make the change with your 35% re-stocking charge [at] no cost to the owner.

**THERMAL DESIGN, INC. v. M&M BUILDERS, INC.**

[207 N.C. App. 79 (2010)]

The 4 January 2008 fax also asked plaintiff again to come and retrieve "your material." No part of the fax references an oral agreement under which plaintiff agreed to accept a return of the Custom Roof.

Mr. Mauldin sent another fax on 7 January 2008 to Mr. Mettenbrink asking that plaintiff come and retrieve the Custom Roof from the project site. In the fax, Mr. Mauldin stated:

> Our steel erector did not bid the project as a retrofit; therefore, *we concluded* late December 21, 2007[,] that it was best to install another system, which was approved by the Architect. The Architect for the project has an email where you stated a re-stocking fee would be *involved* if the material was to be returned.

> In conclusion, your material has to be picked up at the site as soon as possible. The material is in a tractor trailer that needs to be returned and your material is in the way. Finally, let us know when you will be at the site to pick up your material.

(Emphasis added.) Like the 4 January 2008 fax, this fax also failed to mention that there was an agreement for plaintiff to accept a return of the Custom Roof.

On 15 January 2008, Daniel Harkins, plaintiff's vice president, visited the project site. After inspecting the site, looking at the Custom Roof, and talking with M&M about why it did not want to use plaintiff's product, Mr. Harkins came to believe that M&M had no valid reason for making its substitution. Mr. Harkins sent Mr. Mauldin a letter dated 28 January 2008 rejecting a return of the Custom Roof. Mr. Harkins further stated in the letter that plaintiff would attempt to mitigate damages by: (1) talking to the architect for the Allen Jay Recreation Center project in an effort to persuade the architect to use the Custom Roof instead of the substitute; and (2) attempting to find another project for which the Custom Roof could be used.

In a letter dated 11 February 2008, Mr. Harkins again denied M&M's claims that an oral agreement was reached regarding a return of the Custom Roof and offered M&M an alternative. Mr. Harkins explained that a project in Florida could use the Custom Roof, and that if M&M would pay a 35% restocking fee, 50% of the revised purchase order amount, and the cost of shipment, then plaintiff would credit M&M's account approximately $10,000. The remainder of M&M's account would remain overdue for the full purchase price, $18,556.25, plus interest, but Mr. Harkins explained that the credit would cover as much of this amount as possible.

**THERMAL DESIGN, INC. v. M&M BUILDERS, INC.**

[207 N.C. App. 79 (2010)]

Mr. Mauldin sent Mr. Harkins a letter dated 15 February 2008 declining this offer. The same day, M&M tendered to plaintiff a check for $6,494.69, which represented 35% of the revised invoice price for the Custom Roof. Mr. Harkins declined to accept the check and stated in a letter that plaintiff would be filing suit to recover the full amount under the Contract. Mr. Harkins further wrote that the Custom Roof should remain in M&M's possession.

On 23 September 2008, plaintiff filed the current action alleging claims for breach of contract and unjust enrichment. On 18 June 2009, plaintiff filed a motion for summary judgment. The trial court granted plaintiff's motion on 9 July 2009 and awarded plaintiff: (1) $18,556.25, plus interest and (2) attorneys' fees in the amount of $2,783.44. Defendants filed a timely notice of appeal to this Court on 4 August 2009.

## II. ANALYSIS

### A. Jurisdiction and Standard of Review

The trial court's order awarding summary judgment to plaintiff is a final order, and jurisdiction in this Court is proper pursuant to N.C. Gen. Stat. § 7A-27(b) (2009). "We review orders granting summary judgment *de novo." Self v. Yelton*, 201 N.C. App. 653, 658, 688 S.E.2d 34, 37 (2010). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *In re Appeal of the Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003).

Summary judgment is proper when, viewed in the light most favorable to the non-movant, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.R. Civ. P. 56(c) (2010); *see S.B. Simmons Landscaping & Excavating, Inc. v. Boggs*, 192 N.C. App. 155, 163-64, 665 S.E.2d 147, 152 (2008). The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact for trial. *Self*, 201 N.C. App. at 658, 688 S.E.2d at 38. "If a moving party shows that no genuine issue of material fact exists for trial, the burden shifts to the nonmovant to adduce specific facts establishing a triable issue." *Id.*

### B. The Oral Agreement

[1] Defendants argue that there exists a genuine issue of material fact as to whether the parties are bound by the terms of the Contract, because

a substitute oral agreement was reached between Mr. Mauldin and Mr. Mettenbrink regarding a return of the Custom Roof for a restocking fee. Specifically, defendants argue that the 21 December 2007 phone conversation resulted in either: (1) a new contract for a return of the Custom Roof; (2) an oral modification to the Contract's terms and conditions; or (3) a waiver of the terms and conditions of the Contract. We disagree.

Regarding defendants' first two arguments, there are two hurdles: the terms of the Contract and the statute of frauds in the Uniform Commercial Code ("UCC"). We address each in turn.

In the credit application and agreement, the parties' Contract states in part:

> This agreement is a continuing general credit contract and shall remain in effect and be non-cancellable for any charges and interest incurred under this agreement until they are paid in full. The terms of this agreement shall not be altered except with written authorization of a corporate officer of Thermal Design[,] Inc.

Under these terms and conditions, when M&M purchased the Custom Roof from plaintiff, the agreement remained in effect for the duration of the charge on M&M's credit account. Until the credit account was paid in full, any changes to the terms of the Contract needed to be executed in writing by one of plaintiff's corporate officers.

Looking at the plain language of this part of the Contract, M&M's attempt to return the Custom Roof for a restocking fee clearly concerns a charge on the credit account. In essence, M&M sought to rescind its charge on the account in exchange for a return of the Custom Roof and the payment of a restocking fee. This type of agreement, to be enforceable under the terms of the credit application, would need to be negotiated with one of plaintiff's corporate officers and reduced to writing. As defendants concede, this was not done through Mr. Mauldin's phone conversation with Mr. Mettenbrink, because Mr. Mettenbrink was not a corporate officer with plaintiff. Moreover, no writing was signed by one of plaintiff's corporate officers. Thus, any alleged oral agreement Mr. Mauldin may have reached with Mr. Mettenbrink on 21 December 2007 was entirely unenforceable pursuant to the terms of the Contract.

With respect to the statute of frauds, defendants seek to enforce the alleged oral agreement with Mr. Mettenbrink through an excep-

THERMAL DESIGN, INC. v. M&M BUILDERS, INC.

[207 N.C. App. 79 (2010)]

tion in N.C. Gen. Stat. § 25-2-201 (2009).[2] The UCC's statute of frauds, as a general rule, requires contracts for the sale of goods over $500 to be in writing. N.C.G.S. § 25-2-201(1). However, defendants argue that because this transaction took place between merchants,[3] an exception contained in section 25-2-201(2) applies:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

N.C.G.S. § 25-2-201(2). Defendants argue that no objection was raised by plaintiff within ten days of Mr. Mauldin's fax on 4 January 2008, and therefore, an enforceable agreement was reached for a return of the Custom Roof to plaintiff in exchange for the restocking fee.

Any supposed oral agreement reached on 21 December 2007 between plaintiff and M&M would need to meet the requirements of the statute of frauds in section 25-2-201(1). N.C. Gen. Stat. § 25-2-209(2)-(3) (2009); *see* 2A Lary Lawrence *Lawrence's Anderson on the Uniform Commercial Code* § 2-209:90 (2008) [*Lawrence*] ("The exceptions to the statute of frauds that are applicable to an original contract also apply to a modification."). Therefore, in order for the confirming memorandum, the 4 January 2008 fax, to satisfy the merchant's exception in section 25-2-201(2) as defendants contend, three elements are necessary: (1) "it must evidence a contract for the sale of goods"; (2) "it must be 'signed' "; and (3) "it must specify a quantity." N.C.G.S. § 25-2- 201 official cmt. 1; 2 *Lawrence* § 2-201:226 ("The sufficiency of a confirmatory writing for purposes of UCC § 2-201(2) is governed by the same principles as control the sufficiency of a writing under UCC § 2-201(1)."); *see also Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 962 (5th Cir. 1999) ("[T]he only term that must appear in a writing to support an enforceable contract for the sale of goods is the quantity term.").

---

2. The transaction in issue between the parties clearly concerns the sale of "goods," and we therefore apply the UCC to this case. N.C. Gen. Stat. §§ 25-2-102, -105 (2009).

3. The parties do not dispute that they are both merchants in this case. Therefore, for purposes of this analysis, we assume that both plaintiff and M&M are merchants under the UCC. *See, e.g., C. R. Fedrick, Inc. v. Borg-Warner Corp.*, 552 F.2d 852 (9th Cir. 1977) (contractor of construction project and equipment supplier held both to be merchants under the UCC in sale of pumps to contractor by supplier) (applying California law).

**THERMAL DESIGN, INC. v. M&M BUILDERS, INC.**

[207 N.C. App. 79 (2010)]

In this case, the 4 January 2008 fax lacks the first and third elements. In the fax, Mr. Mauldin asks plaintiff to arrange "pick- up for your material"; however, Mr. Mauldin does not mention the prior existence of an agreement to do so, nor does he ascribe a quantity of the "material" to be returned at plaintiff's expense. With respect to the first element in particular, in order to "evidence a contract for the sale of goods" under the merchant's exception in section 25-2-201, the confirming memorandum must be "sufficient against the sender." N.C.G.S. § 25-2-201(2). This means that the language in the 4 January 2008 fax needed to contain at least some sort of expression evidencing that defendant had already *agreed* to be bound in a prior oral exchange. The 4 January 2008 fax offered by defendant lacks any expression of this type, and instead the fax shows that defendant was still in the process of attempting to persuade plaintiff to accept a return of the Custom Roof in exchange for the restocking fee. Moreover, the subsequent fax on 7 January 2008, though not argued by defendant to be a confirming memorandum, is similarly void of any expression indicating plaintiff's intent to be bound.

As to the third element regarding quantity, the revised purchase order included specific quantities of material: 14,387 square feet of Simple Saver Roof System with R30 insulation, 4,487 square feet of Simple Saver Wall System with R19 insulation, 5 boxes of Fast R Wall insulation hangers, and 1,900 feet of Thermal Break foam tape. Though the 4 January 2008 fax mentions the 35% restocking fee, the fax provides no quantity of the above-mentioned materials to be returned. A quantity term in a confirmatory writing need not be specific, and if defendant had indicated in the writing that it wished to return "all" of the Custom Roof, this may well have been sufficient. *See, e.g., Matter of Estate of Frost,* 130 Mich. App. 556, 344 N.W.2d 331 (1984) (term "all wood sawable" sufficient to supply quantity term). The memorandum at issue here, however, offers no definite term at all, and thus it is insufficient to satisfy the statute of frauds.

In light of the foregoing, we can ascertain no genuine issue of material fact showing that the alleged oral agreement reached on 21 December 2007 resulted in either (1) a modification to the Contract or (2) a new contract between the parties for return of the Custom Roof. The Contract expressly forbids such oral agreements, and defendants have failed to satisfy the UCC's statute of frauds. This conclusion, however, does not end our analysis, because defendant further contends that, even if the oral agreement reached on 21 December 2007 is unenforceable, then the oral agreement nevertheless acted as a waiver of the terms and conditions of the Contract between the parties.

Under the UCC, a party may waive the protection afforded by the statute of frauds by later conduct even though a written agreement has been executed. Section 25-2-209 of our General Statutes provides:

(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

(3) The requirements of the statute of frauds section of this article (G.S. 25-2-201) must be satisfied if the contract as modified is within its provisions.

(4) *Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.*

(5) *A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.*

N.C.G.S. § 25-2-209(2)-(4) (emphasis added).

Here, again, the terms of the Contract defeat defendants' argument that there was a waiver. In order for a waiver to occur in this case, the attempted modification or rescission would need to be negotiated by one of plaintiff's corporate officers. Since neither Mr. Mettenbrink nor Mr. Quinn are corporate officers with plaintiff, they did not have any authority to waive the provisions of the Contract. As a result, there could not have been an attempted modification or rescission pursuant to the parties' Contract.

Moreover, this Court has held that a waiver under section 25-2-209 requires more than a mere promise. *Varnell v. Henry M. Milgrom, Inc.*, 78 N.C. App. 451, 455, 337 S.E.2d 616, 619 (1985). Instead, a party asserting waiver must demonstrate, in addition to a promise made by the waiving party, either: (1) additional consideration; (2) material change in position by the promisee based on the alleged oral contract; or (3) conduct on the part of the party offering the statute of frauds as a defense sufficient to show that an oral agreement was reached. *Id.*

**THERMAL DESIGN, INC. v. M&M BUILDERS, INC.**

[207 N.C. App. 79 (2010)]

In this case, defendants argue only that they materially changed position based on the conversation occurring on 21 December 2007. This argument, however, is without merit given that Mr. Mauldin informed the project's architect on 20 December 2007 that a substitute roofing system would be used on the Allen Jay project, the day before the alleged oral agreement was reached with Mr. Mettenbrink. Given that the decision to use a substitute system was made before the oral agreement was allegedly reached, defendants cannot now maintain that they materially changed position based on the phone conversation on 21 December 2007.[4]

Our review of the record shows that there is no genuine issue of material fact as to whether the conversation on 21 December 2007 resulted in either a new contract, a modification, or a waiver of the parties' original Contract. Even viewing the evidence in the light most favorable to defendants, the trial court correctly concluded that plaintiff was entitled to judgment as a matter of law. This assignment of error is overruled.

### C. Mitigation of Damages

[2] Defendants argue that there is a genuine issue of material fact as to whether plaintiff took reasonable steps to mitigate its damages. We disagree. The duty placed on an injured party to mitigate its damages is well established.

> "In an action for tort committed or breach of contract without excuse, it is a well settled rule of law that the party who is wronged is required to use due care to minimize the loss. . . . The burden is on defendant of showing mitigation of damages." Therefore, while the duty is imposed upon the injured party to use ordinary care and prudence to minimize his damages, nevertheless the burden is upon the injuring party to offer evidence tending to show such breach of duty or failure to exercise the requisite degree of care and prudence to reduce and minimize the loss complained of.

*Distributing Corp. v. Seawell*, 205 N.C. 359, 360, 171 S.E. 354, 355 (1933).

---

4. Based on this observation of the record, we decline to address the portion of defendants' brief regarding promissory estoppel. Assuming, without deciding, that promissory estoppel may be used as a defense by defendants, one of the elements is detrimental reliance. *Wachovia Bank v. Rubish*, 306 N.C. 417, 427, 293 S.E.2d 749, 756 (1982). Since the decision to substitute the Custom Roof was made before the alleged oral promise by plaintiff, detrimental reliance cannot be established.

Here, Mr. Mauldin's fax sent at 10:00 p.m. on 21 December 2007 was the first communication to plaintiff that M&M intended to return the Custom Roof, which was specially ordered and manufactured for the Allen Jay project. After this initial fax, Mr. Mauldin sent two other faxes following the December and January holiday season concerning a return of the Custom Roof. On 15 January 2008, plaintiff's vice president visited the project site, and on 28 January 2008 sent Mr. Mauldin a letter explaining two ways in which plaintiff would attempt to mitigate the damages: (1) talk to the architect and (2) attempt to find another project. In a letter dated 11 February 2008, plaintiff's vice president sent M&M a letter explaining a way in which a credit could be applied to M&M's account by sending the Custom Roof to another project in Florida. M&M declined to accept the offer, and the Custom Roof remained at the Allen Jay project site until the initiation of this suit.

These facts show that plaintiff found a potential replacement project for the specially manufactured Custom Roof approximately seven weeks after defendant first informed plaintiff that it intended to return the Custom Roof. Had M&M accepted plaintiff's offer and paid for the freight, approximately $10,000 could potentially have been recovered to apply to M&M's delinquent credit account. Plaintiff offered this opportunity to M&M despite the fact that plaintiff was in the process of providing a new roofing and insulation system to the Florida project, which would have resulted in a lost volume sale[5] to plaintiff. It was only after M&M refused plaintiff's offer that plaintiff manufactured and provided a new roofing system to the project in Florida.

The only evidence offered by defendants to show that there is a genuine issue of material fact that plaintiff did not use due care in mitigating its damages is a letter from Mr. Harkins dated 29 February 2008. Defendants' reliance on this letter, however, is misplaced in light of the above facts. In the 29 February 2008 letter, Mr. Harkin explains at length that plaintiff intended to file suit to recover the full price of the contract, in part because M&M refused to ship the Custom Roof to the project in Florida. No portion of the letter evidences an intent on plaintiff's behalf to increase their damages by failing at their duty to mitigate. To the contrary, the letter recites a lengthy explanation as to how plaintiff had attempted to use the Custom Roof on another project and M&M had refused the offer.

---

5. N.C. Gen. Stat. § 25-2-708(2) (2009).

Given that M&M had already accepted the specially manufactured Custom Roof and kept it on the jobsite for over six weeks before attempting to return it, we conclude that the above actions by plaintiff satisfied its burden of due care to mitigate its damages. The evidence offered by defendants does not create a genuine issue of material fact, and accordingly, plaintiff was entitled to judgment as a matter of law on this issue. This assignment of error is overruled.

## III. CONCLUSION

Based on the foregoing, the order of the trial court is

Affirmed.

Judges STEPHENS and ERVIN concur.