CF INDUSTRIES, INC., and Farmers Chemical Association, Inc., Plaintiffs,

v.

TRANSCONTINENTAL GAS PIPE LINE CORPORATION, Defendant.

No. C–C–77–131.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Feb. 27, 1978.

---

William H. McCullough, Robert H. Spearman, Sanford, Cannon, Adams & McCullough, Raleigh, N. C., Stephen A. Herman, Kirkland, Ellis & Rowe, Washington, D. C., J. S. Crawford, Anthony E. Cascino, Jr., CF Industries, Inc., Long Grove, Ill., E. Osborne Ayscue, Jr., Helms, Mulliss & Johnston, Charlotte, N. C., for plaintiffs.

Lawrence H. Gall, Transcontinental Gas Pipe Line Corp., Houston, Tex., W. Pendleton Sandridge, Jr., Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., W. T. Covington, Jr., Kennedy, Covington, Lobdell & Hickman, Charlotte, N. C., for defendant.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

Plaintiffs, Farmers Chemical Association, Inc. (FCA) and CF Industries, Inc. (CFI), brought this diversity action against defendant Transcontinental Gas Pipe Line Corporation (Transco) on May 18, 1977. FCA and CFI are both agricultural coopera-

tive corporations. FCA as owner and CFI as lessee operate a large fertilizer plant at Tunis, North Carolina, which uses natural gas as a raw material in the manufacture of nitrogen-based fertilizer.[1] Transco is a major interstate natural gas pipeline company which transports gas from fields in the Gulf of Mexico and the southwest to states along the eastern seaboard as far as New York. It is the only interstate pipeline company serving North Carolina. North Carolina Natural Gas Corporation (NCNG), a material participant in the events at issue but not a party in this case, is an intrastate natural gas distribution company which serves eastern North Carolina, including the Tunis area.

The complaint sets out four claims based on a series of dealings among the parties and third persons from 1965 to the present: (1) breach by Transco of a contract to deliver to NCNG certain quantities of natural gas on an uninterruptible basis to be used at plaintiffs' Tunis plant; (2) negligent performance of that contract resulting in foreseeable injury to plaintiffs' operations; (3) fraud arising out of negotiations from 1965 to 1969 between Transco and FCA concerning the location and construction of the Tunis plant; and (4) violation by Transco of North Carolina's Monopolies, Trusts and Consumer Protection Act, N.C.G.S. § 75–1.-1. Plaintiffs seek damages of $16.5 million on each of the first three claims and the same amount trebled on their fourth claim.

The case came before the court on defendant's motion for dismissal under Rule 12(b)(6) or in the alternative for summary judgment under Rule 56. The parties filed lengthy briefs and numerous affidavits and other documents and a hearing was conducted on September 8, 1977. Based upon the materials presented by the parties the court has been able to treat the motion as one for summary judgment on the first

---

1. In 1973 CFI assumed management of the Tunis complex under the terms of an agreement with FCA. This agreement was transformed into a lease in 1976. By the terms of the lease FCA assigned to CFI all its rights under the contract with NCNG. Defendant has

argued that for various reasons CFI has no standing to complain of the acts which form the basis of this suit. Since both FCA and CFI are joined as plaintiffs, the court sees no reason to consider that argument further.

claim only. The supporting affidavits and documents do not address the issues raised by plaintiffs' remaining claims and the motion is therefore treated as one under Rule 12(b)(6) as to those claims.

For the reasons set out below defendant's motion was granted in part and denied in part, by order entered October 11, 1977.

I. *Facts*

The Tunis plant was constructed in 1969 following four years of investigation and study by FCA. FCA's principal concern in planning the complex had been to locate the plant in an area having an assured uninterruptible natural gas supply, such supply being crucial since there was (and is) no commercially feasible alternative to natural gas in the manufacturing process used by the plant. During the same time Transco had become interested in extending from its main north-south pipeline a lateral branch through southeastern Virginia and into northeastern North Carolina. On the basis of existing demand and without a large commitment from new customers in the area, however, it could not justify the extension. Letters and other documents filed by plaintiffs suggest that Transco became actively involved in securing the location of the FCA plant in the area of the proposed pipeline extension and offered assurances to FCA that its natural gas requirements could be met by the new Transco pipeline.

Transco had a general policy not to compete at retail with the local intrastate distribution companies which it also supplied on a wholesale basis; it was therefore not willing to sell directly to FCA. This policy was reinforced by certain tax considerations favorable to Transco and by the fact that Transco's tariffs filed with the Federal Power Commission did not cover direct retail sales of gas. Accordingly, Transco participated with FCA in investigating and selecting among several possible distribution companies in southeastern Virginia and northeastern North Carolina. There is some suggestion in the record that it was immaterial to Transco whether FCA bought its natural gas through an established distribution company or through a shell company organized by FCA to supply only the Tunis plant. Such a company was in fact organized by FCA. However, after discussions with the North Carolina Utilities Commission (which desired the expansion of natural gas service into the northeastern part of the state) and with NCNG, the latter was selected as the distribution company and received permission from the Utilities Commission to serve the area.

By letter of intent dated October 3, 1967, Transco and NCNG agreed to the sale of certain additional gas volumes to be supplied to the new service area. Among other things the agreement was conditioned on NCNG's obtaining a firm commitment to supply gas to the FCA plant and upon Transco's obtaining a certificate of public convenience and necessity to construct its new pipeline extension. The letter recited that the parties were to execute Transco's "CD–2 Service Agreement" on the standard form contract filed with the Federal Power Commission. On November 10, 1967, the contract between FCA and NCNG was signed, providing for a daily maximum supply to FCA of 50,000 Mcf (fifty million cubic feet) of gas. This contract referred to a "companion agreement" to be executed between NCNG and Transco and was apparently drafted to minimize the risks to NCNG of its intermediary status. NCNG's representative in the contract negotiations has characterized the contract as a " 'transportation agreement' drafted in the form of a purchase and sale." (Affidavit of Raymond A. Ransom.) Transco reviewed the FCA–NCNG contract and suggested one or two changes.

Four days later on November 14, 1967, Transco applied to the Federal Power Commission for a certificate of public convenience and necessity to construct the pipeline extension into northeastern North Carolina. In its application Transco specifically represented that the additional pipeline was needed to service the FCA Tunis complex and that the existence of that plant made the pipeline economically feasible. The required Commission approval was

obtained in May, 1968, and on October 2, 1968, Transco and NCNG executed the contemplated standard form contract adding the new gas volumes required for the northeastern area. This latter document made no reference to FCA or to any other customer of NCNG.

NCNG was to receive under the amended contract a total maximum daily volume of 141,000 Mcf (141 million cubic feet) of gas, of which 50,000 Mcf (fifty million cubic feet) had been committed to FCA. FCA alleges that the Tunis plant is by far the largest customer of NCNG and is the largest single industrial customer on the Transco system.

From 1971 onward the Tunis plant has been subjected to increasingly severe gas curtailments, forcing cutbacks in production and lay-offs. Plaintiffs allege that as a result of projected future curtailments they will have to close permanently a portion of the Tunis complex. The natural gas curtailments have been system wide, and Transco claims it no longer has or can purchase sufficient gas to meet contract demands.

## II. Status of FCA and CFI as Third Party Beneficiaries of the Transco-NCNG Contract

◼ The heart of plaintiffs' complaint is the allegation that they are intended third party beneficiaries of the Transco-NCNG contract, entitled to sue for its breach. The North Carolina Supreme Court has adopted the analytical framework of the *Restatement (First) of Contracts* § 133 which recognizes rights of action for "donee" and "creditor" beneficiaries but excludes "incidental" beneficiaries from those rights. *Matternes v. City of Winston-Salem*, 286 N.C. 1, 209 S.E.2d 481 (1974); *Vogel v. Reed Supply Co.*, 277 N.C. 119, 177 S.E.2d 273 (1970). *Vogel*, while endorsing the technical vocabulary of the *Restatement*, also laid down the more general principle which applies to this case:

" . . . [T]he determining factor as to the rights of a third party beneficiary is the intention of the parties who actually made the contract."

277 N.C. at 128, 177 S.E.2d at 279. *Vogel* specifically held that a landowner who had contracted for improvements to his property could not sue as a third party beneficiary of the contract between his contractor and a subcontractor selected by the latter since no intention to give the landowner a direct right against the subcontractor could be found from an examination of the subcontract and surrounding circumstances. From a reading of *Vogel* it would appear that the words "donee" and "creditor" and "incidental" were not treated as words of art but as ways to describe the result.

The threshold problem in this case is whether the court can look outside the "four corners" of the October 2, 1968, standard form contract between Transco and NCNG in order to determine the intent of the parties. Defendant contends that where a contract's terms are clear an unambiguous the parties will not be permitted to adduce extrinsic evidence to explain or enlarge the provisions of the contract. *E. g.*, *Lane v. Scarborough*, 284 N.C. 407, 200 S.E.2d 622 (1973); *Root v. Allstate Insurance Co.*, 272 N.C. 580, 158 S.E.2d 829 (1968). As a general principle this is sound, but the North Carolina courts have not always applied it with great strictness in cases involving third party beneficiaries. The result in *Vogel* itself was reached only after consideration of the nature of the contract and the totality of the circumstances, not just the question whether the landowner was expressly mentioned in the subcontract. In *Potter v. Carolina Water Co.*, 253 N.C. 112, 116 S.E.2d 374 (1960), the court permitted individual citizens to sue as third party beneficiaries of an undertaking by a public utility to supply water to a municipality despite the fact that no third parties were mentioned on the face of the contract in issue. Section 133 of the *Restatement*, in both subsections 1(a) and 1(b), explicitly provides that "creditor" or "donee" beneficiary status is to be determined by looking to "the terms of the promise in view of the accompanying circumstances." The question at this stage is not how the court should construe some disputed term in

a contract but whether the dealings of the various parties have created a certain legal relationship among them. The practice in *Vogel* and *Potter* of looking not only to the contract terms but more generally to surrounding facts is decidedly the better one.[2]

In any event, it is significant in this case that there are several documents, not one only, which recorded the relationship between Transco and NCNG. The October 3, 1967, letter of intent *does* specifically mention FCA and looks ahead to an expected ratification of the agreement reached in that letter by execution of the October 2, 1968, standard form service contract. At this stage no good reason has been shown for ignoring the October 3, 1967, letter agreement or for treating the October 2, 1968, amended standard form contract as anything more than the last in a series of documents defining the contractual relationship between Transco and NCNG. *American Trust Co. v. Catawba Sales & Processing Co.*, 242 N.C. 370, 88 S.E.2d 233 (1955).

Looking beyond the confines of the October 2, 1968, contract, then, the court cannot say there is no material issue as to the intention of Transco and NCNG to benefit FCA. For this reason summary judgment on claim one should be denied.

Defendant, however, has argued that regardless of the outcome on the general issue of intention, plaintiffs cannot be classed as either "creditor" or "donee" beneficiaries. In support defendant turns to the specific language of the *Restatement*. A party may be a "creditor" beneficiary if " . . . performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary . . . ." *Restatement* § 133(1)(b). The

perceived difficulty is that the promisor must apparently render the promised performance *directly* to the beneficiary; it is not enough that the promisor's performance merely enables the promisee to satisfy his obligation to the beneficiary. *Restatement* § 133(1)(b), illustration 9; 4 *Corbin on Contracts* § 779D; *Williston on Contracts* § 402 (3d ed. 1959). Translated into the present context, it is claimed that FCA could not be a "creditor" beneficiary since Transco delivered gas to NCNG and not to FCA directly.

Defendant further argues that FCA cannot qualify as a "donee" beneficiary since there is no intention to make a *gift* of the natural gas to FCA. This is true but also misleading. The actual language of the *Restatement* requires only that " . . . the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary *or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary.*" *Restatement* § 133(1)(a) (emphasis supplied).

The restriction of this clause to cases connoted by the term "gift" is clearly not warranted. See *Restatement* § 133, comment c. It is thus immaterial that FCA was to pay for the natural gas supplied by NCNG so long as the intent to "confer a right against the promisor" is established. What remains problematic about the quoted portion of the formula is that it, like the companion provision governing "creditor" beneficiaries, seems to contemplate that the performance will be rendered by the promisor directly to the beneficiary.[3]

■ The court is persuaded that technical difficulties in classifying plaintiffs as "creditor" or "donee" beneficiaries should

---

2. Defendant points to *Gorrell v. Greensboro Water Supply Co.*, 124 N.C. 328, 336, 32 S.E. 720 (1899) as authority for the proposition that third party beneficiary status can only be determined from the express terms of the contract at issue. *Gorrell* did state that the intent of the parties to benefit third persons was to be drawn from the face of the contract, but it did not hold that it must be so determined in all cases. As noted above, to the extent that *Gor-*

*rell* may have implied such a principle it has not always been followed.

3. It is, of course, possible by some manipulations of language to make the quoted portion of § 133(1)(a) fit the present facts exactly. Plaintiffs could be said to have a right against Transco to have natural gas delivered *to NCNG* and this performance is not one due or supposed or asserted to be due *from NCNG to plaintiffs.*

not undermine the overriding emphasis in the North Carolina cases and in the *Restatement* placed on the intention of the parties as manifested in all the circumstances. In this regard the reformulation of section 133 in the *Restatement (Second)* is significant. Although the North Carolina courts have not expressly accepted this revision of the *Restatement*, its treatment of third party beneficiaries is fully consistent with the decided cases. The *Restatement (Second)* abandons the terms "creditor" and "donee" and their connotations and substitutes instead a class called "intended" beneficiaries. A party may qualify as such " . . . if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . (b) the promise manifests an intention to give the beneficiary the benefit of the promised performance." *Restatement (Second)* § 133(1)(b). Applying this language and assuming for the moment the existence of the requisite intent, it is obvious that FCA was to receive the benefit of the promised performance. As the record now stands there is no evidence that the delivery to NCNG of an additional volume of 50,000 Mcf of gas per day had any other purpose except to enable NCNG to fulfill its contract to supply the Tunis facility.

Despite some similarity in the facts this case is not controlled by the specific holding in *Vogel, supra*. What distinguishes the FCA–NCNG–Transco relationship is the special status of NCNG and the fact that the record at this point suggests active and direct dealings between FCA and Transco concerning the location of and the supply of gas to the complex. Plaintiffs contend that NCNG was only a "paper distributor" and not an independent intervening agent. In contrast, the landowner in *Vogel* had not dealt directly with the subcontractor nor was the contractor viewed as merely a formal party to the various contracts. If plaintiffs should succeed in establishing their contentions on these points and on the more general question of intent, they will have shown an entitlement to sue as third party beneficiaries.

Plaintiffs have called to the court's attention the series of North Carolina cases upholding the rights of citizens to sue, sometimes as third party beneficiaries in contract and sometimes in tort, upon breach of a contract between a water company and a municipality to supply water to the latter. *E. g., Gorrell v. Greensboro Water Supply Co.*, 124 N.C. 328, 32 S.E. 720 (1899); *Jones v. Water Co.*, 135 N.C. 553, 47 S.E. 615 (1904); *Morton v. Water Co.*, 168 N.C. 582, 84 S.E. 1019 (1915); *Potter v. Carolina Water Co.*, 253 N.C. 112, 116 S.E.2d 374 (1960). North Carolina is in this regard one of only a handful of states which has rejected the reasoning of Judge Cardozo in *Moch v. Rensselaer Water Co.*, 247 N.Y. 160, 159 N.E. 896 (1928).

Recently, however, some question has been raised as to the continued vitality of the *Gorrell* rule in North Carolina. In *Matternes v. City of Winston-Salem*, 286 N.C. 1, 13–14, 209 S.E.2d 481 (1974), the court held that an automobile traveler could not sue as third party beneficiary of a contract between the City of Winston-Salem and the State Department of Transportation under which the former was to maintain certain sections of interstate roadway. The court quoted extensively and approvingly from *Moch* and cast doubt on the correctness of the *Gorrell* holding. *Gorrell* was distinguished from the case before the court by the fact that

" . . . there the contract between the city and the water supply company granted to the company a franchise to carry on within the city a public utility business. One accepting and operating under such a franchise assumes duties and incurs obligations more extensive that those incurred by the promisor in an ordinary contract."

286 N.C. at 14, 209 S.E.2d at 488. The treatment of *Gorrell* provoked dissents from two members of the court, and *Matternes* did not expressly overrule the long line of cases stemming from *Gorrell*. The facts of the present case are, in any event, more like the facts in *Gorrell* than like those in *Matternes*. Transco is practically indistinguishable from the water company

franchise holder in *Gorrell*: it is the sole interstate supplier of natural gas to North Carolina, a state without its own natural gas resources, and it is a company whose right to serve the area is regulated at both the federal and state levels under the concept of "public convenience and necessity."

■ It is the court's conclusion that *Gorrell* and its progeny are still applicable to cases of the present type and that the *Gorrell* rationale provides an independent source of authority supporting plaintiffs' claim to third party beneficiary status.[4]

■ The foregoing conclusions also control the disposition of defendant's motion to dismiss the second claim. Defendant apparently concedes that if plaintiffs have standing to sue as third party beneficiaries, then the Transco-NCNG contract creates a legal duty owing from Transco to plaintiffs whose breach is actionable in tort. The right of qualified third party beneficiaries to sue *ex delicto* as well as *ex contractu* where the allegation is that negligent performance of the contract resulted in foreseeable injury to the beneficiary is recognized in North Carolina. *Toone v. Adams*, 262 N.C. 403, 137 S.E.2d 132 (1964).

Several decisions have gone further: a party who may not qualify as a third party beneficiary has been held entitled to sue in tort where the defendant negligently performed contractual obligations owing to his promisee. In *Council v. Dickerson's, Inc.*, 233 N.C. 472, 64 S.E.2d 551 (1951), the court permitted an automobile driver to sue a highway contractor for personal injuries and property damage caused by the contractor's failure to exercise due care while paving a highway under state contract. The court denied a motion to strike allega-

tions concerning the existence of the contract, holding that the contract created an occasion for commission of the tort and that it was immaterial whether the tortfeasor was acting in his own behalf or under contractual obligation. 233 N.C. at 474–75, 64 S.E.2d 551. *See also Pinnix v. Toomey*, 242 N.C. 358, 87 S.E.2d 893 (1955); *Ports Authority v. Roofing Co.*, 32 N.C.App. 400, 232 S.E.2d 846 (1977). These cases do require something more than a showing of breach of contract; they require "affirmative" negligence. Had Transco failed to perform its contract with NCNG altogether it might be argued that it was guilty of nothing more than "nonfeasance." *Council v. Dickerson's*, 233 N.C. at 475–76, 64 S.E.2d 551.

■ This distinction between "nonfeasance" and "misfeasance" has been criticized by Professor Prosser in the context of the "water supply" cases:

"The defendant has in fact entered upon performance of the undertaking and supplied water, so that there is misfeasance, and not nonfeasance at all. By doing so, it has taken on the status of a public utility, and has entered into a relation with individual members of the public which imposes the duty. By its undertaking, and performance, it has induced the city, and the plaintiff, to rely upon it, and to forego opportunities for other protection to which they might have resorted."

*Prosser on Torts* § 99 (3d ed. 1964). In this regard North Carolina's unique *Gorrell* line is directly in point; those cases have occasionally relied on a tort theory *independently* of the discussion of third party beneficiary contract principles. *E. g., Potter v. Carolina Water Co.*, 253 N.C. 112, 116

---

4. Plaintiffs add in their brief, presumably by way of afterthought to the complaint, two additional theories under this general topic. First, they invoke the doctrine of judicial estoppel to contend that Transco should not be permitted to take a position in this suit inconsistent with that adopted in the quasi-judicial proceeding before the Federal Power Commission where Transco represented that its proposed pipeline extension was needed to service the Tunis

plant. Second, plaintiffs suggest the applicability of promissory estoppel on the ground that Transco's representation that it could furnish sufficient gas through NCNG induced FCA to construct the Tunis plant. The latter argument is not strictly relevant to the third party beneficiary issue and appears to present a basis for relief not set out in the complaint. The court finds it unnecessary to express an opinion on either of these arguments at this time.

S.E.2d 374 (1960).[5] Fairly read, the allegations of paragraphs 25 through 27 of the complaint speak not only of nonperformance by Transco but also of negligent and intentional failure to procure adequate natural gas reserves, to purchase available short-term emergency supplies, and to purchase available supplemental supplies of Canadian natural gas, all resulting in foreseeable injury to plaintiffs. Plaintiffs have fairly stated an independent tort claim in their complaint, and for this reason as well as because plaintiffs have stated a claim as third party beneficiaries, defendant's motion for dismissal of the second claim is denied.

### III. *Fraud*

Plaintiffs' third claim turns on allegations that Transco falsely and knowingly or recklessly represented to FCA that it could supply sufficient gas to service the Tunis plant and that in reasonable reliance on such representations FCA constructed the plant and began operations. Defendant's motion rests on several grounds, all without merit and only two of which deserve treatment here. Defendant argues that the representation of "sufficient gas" is not actionable under North Carolina law since it lacks the required definiteness and specificity and since it is not a representation of a past or existing fact but is an opinion or prediction about the future. *See Ragsdale v. Kennedy*, 286 N.C. 130, 209 S.E.2d 494 (1974); *Cofield v. Griffin*, 238 N.C. 377, 78 S.E.2d 131 (1953); *Craig v. Texaco, Inc.*, 218 F.Supp. 789 (E.D.N.C. 1963); *aff'd mem.*, 326 F.2d 971 (4th Cir. 1964).

In *Ragsdale* the court held that representing a business to be a "gold mine" and a "going concern" was sufficiently specific to constitute actionable fraud and noted more generally that the requirement of specificity "depends upon the tendency of the statements to deceive under the circumstances." 286 N.C. at 139, 209 S.E.2d at 500. This eminently sound rule makes dismissal of plaintiffs' claim wholly inappropriate; the court cannot test the tendency of Transco's representations to mislead short of a fuller presentation of the surrounding facts. The *Ragsdale* court similarly rejected an argument that the "gold mine" statement was nothing more than speculation about the future, holding that whether the statement was a mere expression of opinion or a statement of material fact was for the jury to determine. *Id.* Whether a prediction of "sufficient gas" amounts to a representation of fact will depend on the extent to which Transco's special position and knowledge of the facts justified FCA in relying on the soundness of the prediction.

Defendant's second contention is that the complaint on its face shows FCA's reliance on the representations to be unreasonable. As sole support for this argument defendant contends that FCA knew that the ability of Transco to supply natural gas destined for use at Tunis was dependent on variables beyond the control of either party—specifically, the independent actions of NCNG and the regulatory intervention of the Federal Power Commission and the North Carolina Utilities Commission. Again, however, the question of reasonable reliance and the corollary question of plaintiffs' diligence in investigating facts available to them are matters of fact not generally appropriate for treatment under Rule 12(b)(6). *Johnson v. Owens*, 263 N.C. 754, 140 S.E.2d 311 (1956); *cf. Calloway v. Wyatt*, 246 N.C. 129, 97 S.E.2d 881 (1957). Facts alleged at this point suggest that the contingencies stressed by defendant were perhaps not quite so independent of the parties' control as defendant contends or at least that they may not have been so unpredictable as to make plaintiffs' reliance unreasonable as a matter of law. Resolution of the issue must await trial.

### IV. *Unfair Trade Practices Claim*

In 1969 North Carolina amended its Monopolies and Trusts Act, N.C.G.S.

---

**5.** The actual ground of decision in *Potter* is not clear. The opinion endorsed both contract and tort theories and reflects the general merger of these two forms of action in the reasoning of the North Carolina "water supply" cases.

§§ 75–1 *et seq.*, to add a new provision banning "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." N.C.G.S. § 75–1.1; *see generally* Aycock, "Antitrust and Unfair Trade Practice Law in North Carolina—Federal Law Compared," 50 *N.C.L.Rev.* 199 (1972); Comment, "Consumer Protection and Unfair Competition in North Carolina—The 1969 Legislation," 48 *N.C.L.Rev.* 896 (1960). Plaintiffs here seek shelter under that portion of the act prohibiting unfair acts in the conduct of trade or commerce and claim the bounty of treble damages and attorneys' fees allowable under §§ 75–16 and 75–16.1. The basic allegations are that Transco's efforts from 1965 to 1969 to induce FCA to construct its proposed complex at Tunis followed by Transco's intentional failure to purchase sufficient gas to meet its contract obligations to NCNG constitute an unfair practice. Plaintiffs do not suggest that Transco engaged in any "unfair method of competition."

The court has had difficulty fulfilling its *Erie* mandate as to this claim; the number of reported decisions construing the statute is extremely small, and the legislative material is non-existent. There is no administrative agency in North Carolina specially charged with defining the range of conduct covered by a statute which, on its face, purports to prohibit unethical business practices as well as those more traditionally viewed as illegal.[6] *See* N.C.G.S. § 75–1.1(b).

In the most recent case involving § 75–1.1 the North Carolina Supreme Court held that the debt collection activities of a major retailer were not within the compass of the statute. *State ex rel. Edmisten v. J. C. Penney Co.*, 292 N.C. 311, 233 S.E.2d 895 (1977). In reaching this result the court concluded that language limiting the statute to acts or practices in the conduct of "trade or commerce" confined its scope to matters "involved in the bargain, sale, barter, exchange or traffic" of goods or services or to "activities surrounding the 'sale'" of goods or services or to "practices affecting sales" and not to "practices unrelated to the sale" of such goods or services. 292 N.C. at 316–18, 233 S.E.2d 895. Certainly, in this case a contract for the sale of natural gas is at the heart of the dispute; the troublesome question is whether the acts complained of "surround" or "affect" the sale in the manner required by *Penney*. *Penney's* specific holding that acts designed to secure payment for goods sold on credit did not sufficiently involve a sale must give pause. As the dissenters noted, there are strong indications that the majority opinion in *Penney* restricts the application of § 75–1.1 to conduct leading up to the sale or involving inducements for the sale. 292 N.C. 320, 324–26, 233 S.E.2d 895 (Huskins, J., dissenting). The opinion does imply as much when it contrasts situations where a contract is *obtained* as a result of a violation of § 75–1.1 with situations "where a violation occurs which is unrelated to the contract's *formation*," noting that the legislature had provided a remedy in the former case but not in the latter. 292 N.C. at 317, 233 S.E.2d at 899 (emphasis supplied).

Considering the very narrow definition of "trade or commerce" adopted in *Penney*, the court has serious doubts whether plaintiffs have alleged acts or practices "in the conduct of any trade or commerce." Stripped of all the allegations concerning events prior to June 12, 1969, the effective date of § 75–1.1, plaintiffs' fourth claim reduces to a statement that Transco has intentionally refused to purchase available gas supplies which could be used to meet its contractual commitments. As thus defined the cause of action does not appear to involve acts which "surround" or "affect" or "induce" a sale.[7]

---

6. The North Carolina Attorney General is given powers to enforce § 75–1.1 by civil action, but there is no state analogue to the Federal Trade Commission charged with interpreting the statute. N.C.G.S. §§ 75–9 to 75–15.

7. The court has considered and rejected defendant's argument that *Penney* restricted the scope of § 75–1.1 to what are commonly thought of as *consumer* sales. The plain words of the section belie any such construction:

A further defect in the claim as stated is its failure to allege an *unfair* practice. Whether an act or practice is unfair or deceptive within the meaning of § 75–1.1 is a question of law for the court to determine. *Hardy v. Toler*, 288 N.C. 303, 310, 218 S.E.2d 342 (1975). Plaintiffs' claim carries no suggestion of deception, no allegation of any anti-competitive effect, no charge that Transco's purpose was to injure plaintiffs' business. There is no hint of any of the various practices enumerated by the court in *Penney* :

> " . . . false advertising, misnaming and misrepresentation, misleading trade or products names, simulation of well known products or trade names, 'free' goods, deceptive nondisclosures . . ., false disparagement of competing products, misrepresentation of business status or connections, misuse of the term 'guarantee,' misuse of 'seal of approval,' fraudulent sales schemes, deceptive pricing and lottery merchandising."

292 N.C. at 318, 233 S.E.2d at 900, quoting Morgan, "The People's Advocate in the Marketplace—The Role of the North Carolina Attorney General in the Field of Consumer Protection," 6 *Wake Forest Intra.L. Rev.* 1, 18 (1969). This is admittedly not an exhaustive list; it was offered in the context of the court's discussion of "trade or commerce" and not as part of a consideration of whether J. C. Penney's collection activities were in fact "unfair," a question the court never reached. The list is representative, however, of the types of activities which are thought to be fairly covered by § 75–1.1.

Plaintiffs' theory in this case, on the other hand, threatens to make every intentional breach of a commercial contract an unfair trade practice subjecting the breaching party to treble damages. It can hardly be doubted that most, if not all, sellers who fail to deliver in a rising market or buyers who refuse delivery in a falling market do so intentionally, yet these ordinary commercial breaches are wholly foreign to the purposes of § 75–1.1.

It may well be, as the dissenters in *Penney* suggest, that the practical effect of the *Penney* decision is not only to give a narrow construction to the phrase "trade or commerce" but also to read the word "unfair" out of § 75–1.1 and limit the statute to acts or practices involving some element of deception. 292 N.C. at 327, 233 S.E.2d 895. Whatever may be the case generally, the court concludes that on the mere allegation of deliberate or intentional refusal to procure and deliver natural gas, without any suggestion of deception or any claim of injury to competition, plaintiffs have not stated a claim under § 75–1.1.

Plaintiffs argued before the court that their fourth claim could stand without regard to any of the dealings among the parties occurring before the effective date of § 75–1.1. In the alternative, however, plaintiffs contended that Transco's efforts to induce location of the FCA plant in North Carolina, all of which took place before 1969, could be considered if necessary to support the unfair trade practices claim.

Plaintiffs' contention must be carefully distinguished from the separate claim for fraud based on the pre-1969 dealings, and plaintiffs themselves acknowledge that their fourth claim for relief is narrower than the fraud claim. Under plaintiffs' proposed construction it is not material whether the inducements and representations by Transco were in fact false or were known to be so, only that Transco's activities created a relationship among the parties in light of which the subsequent refusal to procure and supply natural gas must be considered "unfair." The emphasis remains on the conduct subsequent to 1969. But the existence of any special relationship based

---

" . . . [T]he purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings *between persons engaged in business*, and between persons engaged in business and the consuming public within this State, to the end that good faith dealings between buyers and sellers *at all levels of commerce* be had in this State."

N.C.G.S. § 75–1.1(b) (emphasis supplied). *Penney* does not hold otherwise.

on pre-1969 dealings does not change the court's conclusion regarding the insufficiency of the fourth claim. All that has been added is an allegation that FCA acted in reliance on promises which were subsequently unfulfilled. This alone fails to distinguish plaintiffs' claim from countless other contract breaches; it adds nothing which could be called some special element of "unfairness."

If the fourth claim is read broadly to include the allegations of pre-1969 *misrepresentation,* a different situation is presented. Such misrepresentations would supply some additional element of unfairness or deception and would also involve events leading up to the formation of a contract. However, the court is convinced that to sustain plaintiff's fourth claim on the basis of this third alternative construction would be to give a retroactive interpretation to § 75–1.1 without any legislative sanction. *See In Re Mitchell,* 285 N.C. 77, 79–80, 203 S.E.2d 48 (1974); *Smith v. Mercer,* 276 N.C. 329, 172 S.E.2d 489 (1970).

 The court is mindful of the general rule that a statute is not rendered retroactive merely because it depends on antecedent facts for its subsequent operation. *Lewis v. Fidelity Co.,* 292 U.S. 559, 570–71, 54 S.Ct. 848, 78 L.Ed. 1425 (1934); *United States v. Village Corp.,* 298 F.2d 816, 820 (4th Cir. 1962). This is a broad principle of statutory construction which takes on meaning only in a specific fact setting. In this case the existence of any violation of § 75–1.1, as construed in *Penney* and applied here, would depend entirely on proof of the conduct occurring before 1969. The essential elements would be the existence of the inducements and their falsity coupled with the later deliberate failure to perform, but the weight of the claim is carried by the allegations of misrepresentation. Under the circumstances the application of § 75–1.1 to such inducements and misrepresentations would necessarily "create a new liability in connection with a past transaction," *Smith v. Mercer,* 276 N.C. at 337, 172 S.E.2d at 494, and thereby amount to an unwarranted retroactive operation of the statute.

The court therefore concludes that defendant is exempt from the statute's coverage and that plaintiff's fourth claim should be dismissed. This conclusion does not reflect upon the viability of the separate common law tort and fraud claims. The court holds only that plaintiffs have not come within the more limited pale of § 75–1.1.

 Finally, and independently of the conclusion reached above, the court also finds that so much of plaintiffs' fourth claim as relates to acts occurring more than one year before the filing date of this suit is barred by the applicable statute of limitations. Although there has been no direct North Carolina ruling on the statute of limitations applicable to actions under §§ 75–1.1 and 75–16, it seems clear that an action for treble damages is an action for a penalty subject to the one-year limitation of N.C.G.S. § 1–54. *North Carolina Theatres, Inc. v. Thompson,* 277 F.2d 673 (4th Cir. 1960); *Thomas v. Petro-Wash, Inc.,* 429 F.Supp. 808 (M.D.N.C.1977); *see J. C. Penney,* 292 N.C. at 319, 233 S.E.2d 895; *Hardy v. Toler,* 288 N.C. at 312, 218 S.E.2d 342 (Huskins, J., concurring).

IT IS THEREFORE ORDERED:

1. Defendant's motion for summary judgment on the first claim is denied without prejudice.

2. Defendant's motion to dismiss the second and third claims under Rule 12(b)(6) is denied.

3. Defendant's motion to dismiss the fourth claim under Rule 12(b)(6) is allowed.