# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SARA LEE CORPORATION,
             *Plaintiff-Appellee,*

v.

QUALITY MANUFACTURING,
INCORPORATED; QUALITY DE SABINAS,
S.A. DE C.V.,
             *Defendants-Appellants.*

No. 02-1565

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, District Judge.
(CA-00-1234-1)

Argued: February 26, 2003

Decided: March 27, 2003

Before WIDENER, KING, and SHEDD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Amiel J. Rossabi, FORMAN ROSSABI BLACK, Greensboro, North Carolina, for Appellants. Kristin Moore Major, KILPATRICK STOCKTON, L.L.P., Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** Mark A. Stafford, KILPATRICK STOCKTON, L.L.P., Winston-Salem, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Quality Manufacturing, Inc. and Quality de Sabinas, S.A. de C.V. ("Quality") appeal the district court's entry of summary judgment in favor of Sara Lee Corporation ("Sara Lee") on Quality's claim for unfair or deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1 (2002) ("Chapter 75"). We affirm.

I

This case arises from the business relationship that existed between the parties for nearly a decade. Sara Lee manufactures and sells apparel through its unincorporated division, Hanes Printables. From the early 1990s until December 2000, Quality operated a garment assembly operation in Mexico. The parties began working together in the early 1990s pursuant to a series of written agreements that each lasted for 12-18 months. Under these agreements, Sara Lee would acquire and ship "cut parts" and related textile materials to Quality; in turn, Quality would assemble the materials into blank sports shirts for Sara Lee to sell. Although not required by the agreements, assembling shirts for Sara Lee was Quality's only line of business.[1]

In January 1998, Sara Lee became contractually bound to purchase cut parts and related materials from National Textiles for all of its self-owned production plants and for its contractors, including Quality. Quality contends that after January 1998, it began receiving an insufficient quantity of cut parts and materials, which caused it to have shortfalls in its production output.

---

[1]Besides sports shirts, Quality also produced a line of T-shirts for Sara Lee (discussed below). Although Quality began a prototype production of an outside line of sweater-jackets in 1998, it shut down this line at Sara Lee's request.

In 1997, 1998, and 1999, Quality signed agreements and returned them to Sara Lee. However, Quality contends that it received no indication that Sara Lee also signed these agreements. Regardless, the parties continued their business relationship during this period and, in the spring of 1999, Sara Lee expressed its intent to enter into another agreement with Quality.

In mid-1999, the parties entered into discussions about Quality beginning a T-shirt product line for Sara Lee. Sara Lee agreed to sell the necessary equipment to Quality for approximately $39,000, and Quality agreed to begin producing T-shirts during the first part of 2000.

In January 2000, Quality requested a loan of $200,000 from Sara Lee in order to avoid closing its plant. At that time, Quality was producing approximately 75% of Sara Lee's sports shirts. Sara Lee agreed to lend Quality $100,000, but it began to have concerns at this point about its relationship with Quality, and it began to explore placing more of its shirt production with other suppliers.

The parties entered into their final agreement (the "2000 agreement") in March 2000. Sara Lee had presented a draft of this agreement to Quality in November 1999, and eventually informed Quality that if Quality did not sign it, Sara Lee would terminate the parties' relationship. This agreement was similar in most respects to the parties' prior agreements. Among other things, this agreement required Sara Lee on a monthly basis to provide Quality with a production schedule containing the production requirements for the next three months. The production schedule was subject to review and revision each month at Sara Lee's sole discretion. This agreement further provided that Sara Lee was under no obligation to use Quality on an exclusive basis or to purchase a minimum number of products from Quality. The agreement's scheduled termination date was December 31, 2000.

Shortly after the parties entered the 2000 agreement, Quality asked Sara Lee for a gift of $250,000 and threatened to close its plant unless Sara Lee obliged. Sara Lee refused, but as an alternative proposed an increase in the assembly price it paid to Quality as a means to supplement Quality's revenue. Quality presented Sara Lee with a plan in

accord with Sara Lee's proposal, and Sara Lee agreed to the new price schedule on May 31, 2000. The following day Quality wrote Sara Lee a letter stating that it was Quality's goal to build sports shirt production to 10,000-12,000 dozen per week. Throughout the parties' relationship, Quality was rarely able to produce more than approximately 8,000 dozen sports shirts per week.

By the late summer of 2000, Sara Lee determined that because of a weakening in the sports shirt market, it no longer needed the shirts produced by Quality. Thus, in August 2000, Sara Lee informed Quality that upon the expiration of the 2000 agreement, it would not renew its relationship with Quality. As a result of the non-renewal, Quality shut down its plant in mid-December 2000.

In December 2000, Sara Lee commenced this litigation seeking a declaratory judgment that it had no liability to Quality arising from their business relationship and asserting claims against Quality for breach of contract and unjust enrichment. Quality answered the complaint and also filed counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and constructive fraud. Quality subsequently added a counterclaim for a Chapter 75 violation.

Both parties moved for summary judgment. Sara Lee sought summary judgment on its claim for declaratory relief and all of Quality's counterclaims. Quality sought summary judgment on Sara Lee's breach of contract and unjust enrichment claims. The district court granted both motions by memorandum opinion and entered judgment accordingly. Quality appeals only the dismissal of its Chapter 75 claim.

## II

Federal Rule of Civil Procedure 56(c) provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We review a district court's grant of summary judgment *de novo*, viewing all facts and inferences in a light most favorable to the

nonmoving party. *Haulbrook v. Michelin North America*, 252 F.3d 696, 702 (4th Cir. 2001).

Chapter 75 prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). The Supreme Court of North Carolina recently discussed the requirements for a Chapter 75 claim:

> In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive. The determination as to whether an act is unfair or deceptive is a question of law for the court.

*Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001) (citations omitted). Chapter 75 only applies where the plaintiff pleads and proves some type of "egregious" or "aggravating" circumstances. 548 S.E.2d at 711.

In rejecting Quality's Chapter 75 claim, the district court noted that it had already ruled as a matter of law against Quality on the claims for breach of contract, violation of the covenant of good faith and fair dealing, breach of fiduciary duty, and constructive fraud,[2] and it then found that Quality had not offered any evidence of aggravating circumstances that would amount to a Chapter 75 violation.[3] Our review

---

[2]The district court expressly found, among other things, that Sara Lee did not breach the 2000 agreement because that agreement did not bind Sara Lee to purchase a guaranteed number of shirts from Quality. The district court also found that Sara Lee did not violate the duty of good faith and fair dealing because Sara Lee provided Quality with sufficient cut parts to meet the production schedules and because Sara Lee was under no obligation to disclose to Quality its future production plans. The district court further found that the parties' mutual interdependence did not give rise to a fiduciary duty on Sara Lee's part.

[3]In light of this ruling, the district court was not required to consider the commerce and proximate cause elements of the Chapter 75 claim, and those matters are not before us.

of the record leads us to conclude that the district court's ruling is correct.

### III

Quality's Chapter 75 claim centers on its theory that despite the parties' agreements, Sara Lee acted in a manner that was destined, if not designed, to cause Quality's ultimate failure. Quality asserts that it produced evidence of a scheme by Sara Lee to ensure Quality's high level of production until Sara Lee's self-owned facilities were at full capacity, as well as evidence that Sara Lee deliberately steered non-defective cut parts and materials to its own facilities at the expense of Quality's production. Quality's general theory appears primarily to encompass three specific categories of alleged unfair or deceptive conduct by Sara Lee.

### A.

Quality first points to the nature of the relationship between the parties, asserting generally that the agreements between the parties were "onerous and one-sided," and that Sara Lee constantly involved itself into, and even directed, Quality's activities. Specifically, Quality contends that Sara Lee: (1) assisted in the creation of Quality, (2) regularly provided equipment and materials to Quality, (3) provided personnel to oversee Quality's manufacturing process, (4) conducted frequent operations meetings and quality reviews, (5) demanded exclusivity from Quality, (6) required Quality to receive all cut parts and materials from, or at the direction of, Sara Lee, (7) dictated one-sided agreements that afforded little protection to Quality, and (8) threatened to terminate the parties' entire relationship if Quality did not sign the 2000 agreement. Quality states that its "economic fate" was therefore tied to Sara Lee.

Although there can be little doubt that Quality's economic fate was, under the circumstances, tied to Sara Lee,[4] we find nothing in the record to substantiate Quality's contention that Sara Lee's overall

---

[4]This is particularly true when consideration is given to Quality's demands for a loan and a gift of money, both of which Sara Lee consented to in a manner that appears to have been satisfactory to Quality.

relationship with Quality was somehow unfair or deceptive. Quality's assertions that Sara Lee may have had significant involvement with Quality's operations reveal nothing more than the fact that Sara Lee worked with Quality in an effort to ensure that the parties' agreement would be successful. Quality's assertion that Sara Lee demanded exclusivity is contrary to the evidence in the record (notably the 2000 agreement) and, in any event, is not unfair. The fact that Quality was required to obtain its cut parts through Sara Lee simply reflects the term of the agreements the parties entered, and it is not unfair or deceptive. Finally, Quality's assertion that Sara Lee dictated the parties' agreements and threatened to terminate their relationship if Quality did not sign the 2000 agreement simply does not, under the circumstances of this case, constitute conduct that is unfair or deceptive for purposes of Chapter 75.

## B.

Quality next points to Sara Lee's alleged failure to ensure that Quality received sufficient non-defective cut parts. Quality asserts that after January 1998, when Sara Lee became contractually bound to purchase all cut parts and related materials from National Textiles for Sara Lee's self-owned plants as well as for Sara Lee's contractors (including Quality), Sara Lee controlled the output of materials coming from National Textiles, and Sara Lee ensured that its internal manufacturing facilities received sufficient non-defective cut parts and materials. Quality argues that Sara Lee did not provide it with the same protection, and Sara Lee's failure to do so led to Quality's production problems.

We find this contention to be without merit. Sara Lee produced evidence establishing that Quality had sufficient cut parts in its inventory to meet the production schedules throughout the calendar year 2000. Despite having this inventory, Quality was unable to meet the production levels listed on the production schedules. Quality has not directed us to any evidence to establish that Sara Lee either requested or instructed National Textiles to send (or cause to be sent) insufficient cut parts to Quality.

## C.

Finally, Quality contends that Sara Lee's termination of the parties' relationship was unfair and deceptive. Quality argues that while Sara

Lee was secretly increasing its sports shirt production in its self-owned plants with the goal of replacing Quality, it nonetheless induced Quality to begin production of T-shirts in Spring 2000 and to purchase equipment and invest capital to organize and train production lines.

Again, we find Quality's contention to be meritless. The evidence shows that as early as 1998, Quality was aware that Sara Lee was increasing its in-house sports shirt operation. By the summer of 2000, following Quality's successful demands for a loan and price concessions from Sara Lee, the demand for sports shirts had dropped precipitously. At that point, Sara Lee exercised its contractual right and chose not to renew the parties' agreement. Other than Quality's assertion, there is nothing to suggest that the parties' T-shirt agreement or Sara Lee's decision to terminate the parties' relationship was part of any scheme to injure Quality, and we find nothing to support Quality's assertion that Sara Lee acted unfairly or deceptively.

IV

In summary, we conclude that the district court correctly determined that Quality failed to present sufficient evidence to support its Chapter 75 claim. Accordingly, we affirm the judgment of the district court.[5]

*AFFIRMED*

---

[5]Like the district court, we do not reach Sara Lee's alternative argument that Chapter 75 is inapplicable because Quality did not suffer an in-state injury.