Maxwell Foods, LLC v. Smithfield Foods, Inc., 2021 NCBC 50.

STATE OF NORTH CAROLINA

WAYNE COUNTY

MAXWELL FOODS, LLC,

          Plaintiff,

v.

SMITHFIELD FOODS, INC.,

          Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 1430

**ORDER AND OPINION ON
DEFENDANT'S PARTIAL
MOTION TO DISMISS**

1. For over 25 years, Maxwell Foods, LLC has supplied swine to Smithfield Foods, Inc. under an output contract. Once one of the country's largest swine suppliers, Maxwell recently began cutting its production and will soon be out of the hog business entirely. Maxwell blames Smithfield for its demise. The nub of the complaint is that Smithfield—the dominant player in the hog market—has used its market position to depress prices, rendering the output contract unprofitable for Maxwell. Although aware of Maxwell's tenuous financial position, Smithfield supposedly slashed its purchases, refused to renegotiate swine prices, and reneged on its promise to give Maxwell the same pricing and related economic benefits given to other suppliers. Believing these steps were designed to force it out of business, Maxwell has sued Smithfield for sundry breaches of the output contract and for unfair and deceptive trade practices.

2. Smithfield has moved to dismiss most of the pending claims. For the following reasons, the Court **GRANTS in part** and **DENIES in part** the motion.

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Reid L. Phillips, Charles E. Coble, Eric M. David, Amanda S. Hawkins, and Shepard D. O'Connell, for Plaintiff Maxwell Foods, LLC.[1]*

*Robinson, Bradshaw & Hinson, P.A., by Robert E. Harrington, Ethan R. White, and Mark A. Hiller, for Defendant Smithfield Foods, Inc.*

Conrad, Judge.

## I.
## BACKGROUND

3. The Court does not make findings of fact on a motion to dismiss. The following background assumes that the amended complaint's allegations are true.

4. Smithfield is the largest pork producer in the world, processing over six billion pounds annually. On the East Coast alone, it owns and operates three plants—one in Virginia and two in North Carolina—that together process over 55,000 hogs per day. (*See* Am. Compl. ¶¶ 10–12, ECF No. 7.) Smithfield sources hogs from hundreds of its own farms and from many independent suppliers, including Maxwell. (*See* Am. Compl. ¶¶ 7, 8, 14, 15.)

5. The production sales agreement ("PSA") between Smithfield and Maxwell dates back to the mid-1990s and is still in effect. (Am. Compl. ¶¶ 7, 8, 16, 28; *see also* Am. Compl. Ex. 1 ["PSA"].)[2] It is an output contract. Subject to adjustments and conditions that are not relevant for present purposes, Smithfield must buy all

---

[1] After this motion was fully briefed, Ms. O'Connell moved for leave to withdraw as counsel for Maxwell, which the Court granted. (ECF No. 32.)

[2] Maxwell Foods, LLC, the plaintiff here, is the successor-in-interest to Maxwell Foods, Inc., the party to the PSA. (*See* Am. Compl. ¶¶ 1, 2, 16; PSA, Preamble.)

"Market Swine"—up to 155,000 per month—produced by Maxwell in Virginia and the Carolinas.  (*See* Am. Compl. ¶¶ 16, 21–23; PSA ¶¶ 1(e), 3(a).)

6.     Pricing figured heavily in the parties' negotiations over the PSA and is the seed of their current dispute.  The parties agreed to a per-pound purchase price equal to "Market Value" plus or minus various premiums, discounts, and credits.  (PSA ¶¶ 1(f), 5(b).)  Market Value is tied to the average daily price quoted for hogs sold on the Iowa-Southern Minnesota spot market.  (PSA ¶ 1(b).)  Readers may wonder why the agreement looks to a market in the Midwest for hog sales in the Southeast.  At the time of the PSA, spot market transactions (also called negotiated sales) were prevalent in the hog trade.  (*See* Am. Compl. ¶ 38.)  Maxwell and Smithfield chose the Iowa-Southern Minnesota spot market "to establish a relatively stable national market price" as the basis for calculating Market Value.  (PSA ¶ 1(b).)  Recognizing that the marketplace might change, they agreed to "designate a substitute basis" if the Iowa-Southern Minnesota market ever ceased to be viable, backed by a "right to submit the matter to arbitration" should they fail to reach an agreement.  (PSA ¶ 1(b).)

7.     Maxwell also demanded assurances that Smithfield would not treat it less favorably than Smithfield's other major suppliers.  (*See* Am. Compl. ¶¶ 18, 19.)  Just one day after inking the PSA, the parties signed a letter agreement with additional terms, including a "most-favored-nation" clause.  (Am. Compl. ¶ 28; *see also* Am. Compl. Ex. 2 ["Letter Agrmt."].)  Smithfield represented that the PSA gave Maxwell "the same economic incentives (including any Grade and Yield Matrix) as given all of

Smithfield Foods' other major swine suppliers" and further agreed to offer Maxwell "the benefit of future changes in economic benefits given said major swine suppliers" during the PSA's term. A handwritten annotation states that Smithfield's "[m]ajor swine suppliers include Carroll's Foods, Inc., Murphy Family Farms, Inc., and Prestage Farms, Inc." (Letter Agrmt. ¶ 1; *see also* Am. Compl. ¶¶ 17, 30, 32.)

8. Nearly twenty-seven years have elapsed since the PSA was signed. In that time, the national hog market has seen immense change. There are fewer hog farms, due in part to industry consolidation. There are also fewer negotiated sales, falling from sixty percent of all hog sales in 1994 to twelve percent in 2004 to less than two percent in 2021. (*See* Am. Compl. ¶¶ 37, 39–41.) Thinly traded spot markets are, as alleged, "easily manipulated" by pork processors. (Am. Compl. ¶ 46.) This has changed the way the industry does business. As the number of negotiated sales has dwindled, the number of marketing agreements between processors and suppliers has swelled. Those looking for a reliable base price for their marketing agreements now favor index pricing and wholesale (or "cut out") pricing over spot market prices. (*See* Am. Compl. ¶ 47.)

9. Smithfield was "a leader" in the "effort" to consolidate the hog market. (Am. Compl. ¶ 37.) It expanded its own hog-farming operations and acquired two of its major suppliers, Carroll's and Murphy. (*See* Am. Compl. ¶¶ 42–45.) These acquisitions, according to Maxwell, have made Smithfield the "dominant pork processor in the Southeast"—so dominant that it "controls the market for hog processors in the Southeast" and wields "monopoly buyer power." (Am. Compl. ¶¶ 50,

87, 88.) Likewise, vertical integration allows Smithfield to control much of its pork production from top to bottom, beginning with breeding and ending with processing and packing. (*See* Am. Compl. ¶ 14.)

10. Smithfield's success is Maxwell's sorrow. Indeed, Maxwell believes that Smithfield has used its market power to manipulate the Iowa-Southern Minnesota spot market and depress swine prices. (*See* Am. Compl. ¶¶ 46, 88.) By 2017, volume at the Iowa-Southern Minnesota market dropped to the point that it ceased to be viable. (*See* Am. Compl. ¶ 52.) As a direct consequence, the PSA "no longer yields pricing that allows Maxwell to operate at a profit." (Am. Compl. ¶ 48.) Maxwell has repeatedly proposed a substitute basis for determining Market Value in the PSA, but Smithfield has rejected its proposals and refused to negotiate. (*See* Am. Compl. ¶¶ 59–67.)

11. That is not how Smithfield has dealt with its other major suppliers. At some point (the amended complaint does not say when), Maxwell learned that Smithfield had given other major suppliers (the amended complaint does not say which) better terms, such as index or cut out pricing. (*See* Am. Compl. ¶¶ 68, 81–83.) Maxwell further alleges that Smithfield stopped sharing production and sales information with its major suppliers in 2016—information that might have revealed its discriminatory pricing practices. (*See* Am. Compl. ¶ 55.) Confronted by Maxwell, Smithfield did not deny the charge that it had given other suppliers better terms. (*See* Am. Compl. ¶¶ 84, 85; Am. Compl. Ex. 3.)

12. The relationship between Maxwell and Smithfield deteriorated just as the COVID-19 pandemic began to unfold. In April 2020, without invoking the PSA's force majeure provisions, Smithfield halved its purchases from Maxwell. (*See* Am. Compl. ¶¶ 70–72.) Maxwell alleges that Smithfield could have continued buying the entire output but chose to maximize purchases from its own affiliates instead. (*See* Am. Compl. ¶¶ 75, 79.) Because Smithfield is the only processor "with the capacity to handle Maxwell's production," Maxwell faced a backup of hogs, had to reduce its output, and has since begun winding down its business entirely. (Am. Compl. ¶¶ 50, 72–78, 86.)

13. This suit followed. The original complaint included claims for breach of the most-favored-nation clause and breach of the output requirement. It also claimed that Smithfield breached a duty to renegotiate the PSA's pricing formula once the Iowa-Southern Minnesota spot market was no longer viable. After Smithfield unsuccessfully tried to remove the case to federal court, Maxwell amended its complaint to add a claim for unfair or deceptive trade practices under N.C.G.S. § 75-1.1 based partly on allegations that Smithfield "abused its monopoly buyer power" in an effort "to target Maxwell unfairly and to force Maxwell out of the hog business." (Am. Compl. ¶ 88.) Smithfield cited the new claim as grounds to designate this action as a mandatory complex business case, which Maxwell opposed. The designation was upheld, though, "[b]ecause there exists a material issue of antitrust law that must be resolved to litigate Maxwell's claim arising under section 75-1.1."

*Maxwell Foods, LLC v. Smithfield Foods, Inc.*, 2021 NCBC LEXIS 39, at *6 (N.C. Super. Ct. Apr. 13, 2021) (Bledsoe, C.J.) (located at ECF No. 20).

14. Now, Smithfield has moved to dismiss three of the four pending claims under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. (ECF No. 21.) The motion has been fully briefed, and the Court held a hearing on 21 May 2021. This matter is ripe for resolution.

## II.
## LEGAL STANDARD

15. A Rule 12(b)(6) motion "tests the legal sufficiency of the complaint." *Isenhour v. Hutto*, 350 N.C. 601, 604 (1999) (citation and quotation marks omitted). The motion should be granted only when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation and quotation marks omitted).

16. In deciding the motion, the Court must treat the well-pleaded allegations of the complaint as true and view the facts and permissible inferences in the light most favorable to the nonmoving party. *Sykes v. Health Network Sols., Inc.* (*Sykes*), 372 N.C. 326, 332 (2019); *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51 (2016). Exhibits to the complaint are deemed to be part of it and may also be considered, *see Krawiec v. Manly*, 370 N.C. 602, 606 (2018), but the Court need not accept as true any "conclusions of law or unwarranted deductions of fact," *Wray v. City of Greensboro*, 370 N.C. 41, 46 (2017) (citation and quotation marks omitted).

III.
ANALYSIS

17.     Smithfield challenges the claims for breach of the most-favored-nation clause, breach of the duty to negotiate, and violation of section 75-1.1.  The Court will address each claim in turn.

A.  Most-Favored-Nation Clause

18.     Maxwell alleges that Smithfield breached the most-favored-nation clause by giving other major swine suppliers better terms, including a more favorable pricing formula.  (*See* Am. Compl. ¶¶ 94–102.)  Smithfield argues that this clause is unenforceable because it is hopelessly vague and indefinite.  (*See* Br. in Supp. 6–13, ECF No. 22.)

19.     Definiteness is an aspect of contract formation.  "It is essential to the formation of any contract that there be mutual assent of the parties to the terms of the agreement so as to establish a meeting of the minds."  *Creech v. Melnik*, 347 N.C. 520, 527 (1998) (citation and quotation marks omitted).  The terms "must be definite and certain or capable of being made so."  *Horton v. Humble Oil & Refin. Co.*, 255 N.C. 675, 679 (1961) (citations and quotation marks omitted).  "When an agreement is 'so vague and indefinite that it is not possible to collect from it the full intent of the parties,' then there was no true meeting of the minds, and the agreement 'is void.'"  *Epic Chophouse, LLC v. Morasso*, 2020 NCBC LEXIS 101, at *7–8 (N.C. Super. Ct. Sept. 8, 2020) (quoting *Holder v. Home Mortg. Co.*, 214 N.C. 128, 133 (1938)).

20.     There are good reasons for this rule.  Because contracts are consensual arrangements, it is up to the parties to define their material rights and obligations.

When they haven't, "neither the court nor the jury can make an agreement for" them. *Holder*, 214 N.C. at 133 (citation and quotation marks omitted). Incomplete and incomprehensible agreements also pose a practical problem: "a court cannot enforce a contract unless it can determine what it is." *F. Indus., Inc. v. Cox*, 45 N.C. App. 595, 599 (1980) (cleaned up); *see also Boyce v. McMahan*, 285 N.C. 730, 734 (1974).

21. But "[t]he law does not favor the destruction of contracts on account of uncertainty." *Chew v. Leonard*, 228 N.C. 181, 185 (1947). If the parties' intent "can be ascertained," the Court should, "if possible, so construe the contract as to carry into effect" that intent. *Id.* (citations and quotation marks omitted). Parties presumably intend that their agreements will be effective. Demanding perfect clarity would frustrate that intent, make it harder to draft contracts, and render contractual relationships less certain rather than more. Courts "must take language as it is and people as they are. All agreements have some degree of indefiniteness and some degree of uncertainty." *Carolina Helicopter Corp. v. Cutter Realty Co.*, 263 N.C. 139, 146 (1964) (citation and quotation marks omitted). Indefiniteness is fatal only when the court cannot reasonably ascertain what was intended "from the language used, construed with reference to the circumstances surrounding the making of the contract." *Welsh v. N. Telecom, Inc.*, 85 N.C. App. 281, 290 (1987).[3]

---

[3] Although both parties appear to agree that the PSA is governed by the Uniform Commercial Code, neither discussed it in any depth. The Code is arguably more tolerant of vagueness than the common law. *See, e.g.*, N.C.G.S. § 25-2-204(3) ("Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."); *id.* § 25-2-202(a) (stating that contract terms "may be explained or supplemented by course

22.     The most-favored-nation clause is hardly so vague as to defy understanding. Smithfield assured Maxwell that the PSA gave it "the same economic incentives" as given all "other major swine suppliers" and promised to offer Maxwell "the benefit of future changes in economic benefits given said major swine suppliers during the term of this contract."   (Letter Agrmt. ¶ 1.)   The undeniable intent was to ensure that Smithfield would treat Maxwell just as well as similarly situated suppliers.   Clauses like this one are both common and commonly enforced.  *See State ex rel. Utils. Comm'n v. Eddleman*, 320 N.C. 344, 376 (1987) (observing that the "clear intent" of a most-favored-nation clause was to "to equalize the net monetary benefits" for the contracting party and another similarly situated party).[4]

23.     Smithfield frets that the phrase "economic benefits" is boundless and could include any term in the PSA—pricing, of course, but also length of term, limits on assignability, and even choice of law.   Without a definition in the PSA, Smithfield

---

of performance, course of dealing, or usage of trade"); *Carolina Builders Corp. v. Howard-Veasey Homes, Inc.*, 72 N.C. App. 224, 228 (1985).

[4] *See also, e.g.*, *DeLoach v. Lorillard Tobacco Co.*, 391 F.3d 551, 555 (4th Cir. 2004) (construing clause in settlement agreement that provided that defendants' obligations "would be 'no less favorable' to them 'than those terms agreed to' " in any later settlement plaintiffs might reach with another co-defendant); *Albertini v. Warner Music Grp. Corp.*, 2008 U.S. Dist. LEXIS 103878, at *2, *7 (S.D.N.Y. Dec. 23, 2008) (concluding that most-favored-nation clause was "neither ambiguous nor reasonably subject to more than one interpretation" when it provided that employee would "be treated no less favorably than" another), *aff'd*, 351 F. App'x 547 (2d Cir. 2009); *Eveleth Taconite Co. v. Minn. Power & Light Co.*, 301 Minn. 20, 27 (1974) ("In our judgment, there is little doubt that the parties intended that the most-favored-nations clause would protect plaintiff from being placed in a noncompetitive position by provisions in its contracts with defendant . . . which were less advantageous than provisions its competitors might be granted by defendant at a later time during the agreed-upon span of plaintiff's contracts."); *Hyatt v. Al Jazeera Am. Holdings II, LLC*, 2016 Del. Ch. LEXIS 57, at *29 n.54 (Del. Ch. Mar. 31, 2016) ("Generally speaking, 'MFN provisions' are undertakings that the contracting party will be treated at least as well as other [parties] similarly situated.").

contends, the parties and the Court are left "to guess" at what is and isn't an economic benefit. (Br. in Supp. 8.)

24. The uncertainty, if any, is not insoluble. The words "economic" and "benefit" are neither technical nor obscure. They might be broad, but it would be a mistake to equate breadth with ambiguity, much less indefiniteness. Besides, contract terms are not construed in isolation but "as a whole." *State v. Philip Morris USA Inc.*, 359 N.C. 763, 773 (2005). The surrounding text obviates much of the guesswork by pointing to the "economic incentives" given to "other major suppliers"—three are named—as benchmarks for comparison and by specifying the PSA's "Grade and Yield Matrix" as one of those incentives, (Letter Agrmt. ¶ 1). *See Welsh*, 85 N.C. App. at 291 (construing "company benefits" with reference to company policies and retirement plan); *La Tortilleria, Inc. v. Nuestro Queso, LLC*, 2014 U.S. Dist. LEXIS 43344, at *8 (M.D.N.C. Mar. 31, 2014) (construing "equivalent pricing" and "comparable quality" by using "a clear benchmark for comparison" in contract), *R. & R. adopted*, 2014 U.S. Dist. LEXIS 94315 (July 11, 2014).

25. Smithfield objects that "economic incentives" and "economic benefits" cannot be the same because contracting parties ordinarily intend different words to have different meanings. (*See* Br. in Supp. 8 (citing *Hunter v. Town of Mocksville*, 897 F.3d 538, 552 (4th Cir. 2018)).) Here, though, the context suggests that the terms are interchangeable. And in any event, canons of construction are tools, not absolutes. Smithfield uncouples incentives and benefits as a means to destroy the most-favored-nation clause, not to construe it. Yet the aim of contract construction is for "every

provision . . . to be given effect." *Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629 (2003). When contract language "is susceptible of two meanings, one of which will destroy it or render it invalid, the former will be adopted so as to uphold the contract." *Torrey v. Cannon*, 171 N.C. 519, 521 (1916) (citation and quotation marks omitted); *accord Slocumb v. Raleigh, Charlotte & S. R.R. Co.*, 165 N.C. 338, 341 (1914).

26. Regardless, it is rare to hold a contract void for vagueness at the pleading stage. This is because extrinsic evidence, such as "preliminary negotiations and surrounding circumstances," may "explain and clarify the contract's terms." *Thomco Realty, Inc. v. Helms*, 107 N.C. App. 224, 227–28 (1992). Maxwell has alleged that "economic benefits" were "understood and intended by the parties" to include "the pricing of hogs, the market or index that served as the base price for hogs, the Market Value, the Average Terminal Price, and the Grade and Yield Matrix."[5] (Am. Compl. ¶ 33.) These allegations must be taken as true, and Maxwell is entitled to discovery and a chance to prove its preferred interpretation. *See Boyce*, 285 N.C. at 734 ("In the usual case, the question whether an agreement is complete or partial is left to inference or further proof."); *Epic Chophouse*, 2020 NCBC LEXIS 101, at *8 ("Usually, whether there was a meeting of the minds is a question of fact.").

27. The Court has considered Smithfield's remaining arguments and finds them equally unpersuasive. The phrase "benefit of future changes" is no less definite than

---

[5] To Smithfield's dismay, Maxwell goes on to say that the contemplated economic benefits also include "any other economic benefits." (Am. Compl. ¶ 33.) This sort of circularity won't do at trial, but a little lenity is allowed in the pleadings.

"economic benefits" for essentially the same reasons. Indeed, courts often describe the purpose of most-favored-nation clauses using similar language. *See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. Reebie Storage & Moving Co.*, 815 F. Supp. 1131, 1135 (N.D. Ill. 1993) (describing clause to mean that "if I give somebody else a better deal at any point during the life of our contract, I promise to give you the benefit of that better deal too"); *Claassen v. City of Newton*, 2015 Kan. App. Unpub. LEXIS 528, at *3 (Kan. Ct. App. June 26, 2015) ("Basically, a most favored nations provision requires Party A to modify its contract with Party B to include more beneficial terms Party A agrees to in later contracts with other parties.").

28. Last, with minimal explanation, Smithfield calls the most-favored-nation clause an unenforceable agreement to agree. (*See* Br. in Supp. 7.) Courts routinely refuse to enforce mere letters of intent, statements of good faith, and other preliminary arrangements that leave material terms open to future negotiations. *See, e.g., Boyce*, 285 N.C. at 734. This clause is none of those. Smithfield is not subject to terms it cannot anticipate or to an indefinite obligation to agree to something in the future. Rather, it has a fixed and final obligation to offer Maxwell the economic benefits given to other major suppliers. Nothing about that is left to future agreement.

29. The Court therefore denies Smithfield's motion to dismiss Maxwell's claim for breach of the most-favored-nation clause.

B. Duty to Negotiate

30. According to Maxwell, the parties were required to negotiate in good faith to establish a new basis for determining Market Value once the Iowa-Southern Minnesota spot market ceased to be viable. Maxwell claims that Smithfield breached the PSA by refusing to negotiate. (*See* Am. Compl. ¶¶ 104–10.) Smithfield argues that it did not breach any duty to negotiate because none exists. (*See* Br. in Supp. 13–18.)

31. Contracts sometimes include express promises to negotiate additional terms in good faith. These promises may be enforceable, and depending on the circumstances, allegations that one party refused to negotiate might support a claim for breach of contract. *See Recurrent Energy Dev. Holdings, LLC v. SunEnergy1, LLC*, 2017 NCBC LEXIS 18, at *43–47 (N.C. Super. Ct. Mar. 7, 2017) (addressing express agreement to "use best efforts to negotiate [the anticipated transaction] in good faith"); *New Friendship Used Clothing Collection, LLC v. Katz*, 2017 NCBC LEXIS 72, at *40–44 (N.C. Super. Ct. Aug. 18, 2017) (addressing express agreement "to negotiate in good faith the terms of the acquisition that remained open").

32. Not so here. The PSA requires the parties to "designate" a new basis for determining Market Value. It then allows either party to compel arbitration for that purpose beginning sixty days after the Iowa-Southern Minnesota spot market ceases to be viable. (*See* PSA ¶ 1(b).) Missing is any promise to negotiate the new basis in good faith.

33. Maxwell argues that the duty to negotiate is implied because the PSA requires designation of a new basis for Market Value by mutual agreement and no mutual agreement is possible absent negotiations. This is unpersuasive for two reasons. First, the parties expressly agreed to *arbitrate* their disagreements, not to *negotiate* them. The Court must construe the PSA as written, leaving out "imagined terms" that the parties could have included but did not. *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 686 (2018). Second, Maxwell conceded at the hearing that the bare promise to designate a new basis—unlike the agreement to arbitrate—is itself a nonbinding agreement to agree. No duty to negotiate arises from a mere agreement to agree. *See Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2016 NCBC LEXIS 77, at *6–19 (N.C. Super. Ct. Oct. 7, 2016); *Comput. Design & Integration, LLC v. Brown*, 2018 NCBC LEXIS 216, at *61–65 (N.C. Super. Ct. Dec. 10, 2018); *Remi Holdings, LLC v. IX WR 3023 HSBC Way L.P.*, 2016 NCBC LEXIS 110, at *16–19 (N.C. Super. Ct. Dec. 12, 2016).

34. Furthermore, the only case that has recognized an implied duty to negotiate had "unique facts." *RREF BB Acquisitions, LLC v. MAS Props., L.L.C.*, 2015 NCBC LEXIS 61, at *57 (N.C. Super. Ct. June 9, 2015). There, the Court "did not imply a duty to negotiate in good faith based on the terms" of the agreement at issue but concluded that there was a question of fact as to "whether the parties had entered into an agreement to continue negotiating in good faith" based on their conduct. *Insight Health*, 2016 NCBC LEXIS 77, at *8–10 (discussing *RREF*'s unique facts and narrow holding). Nothing of the sort is alleged here. Maxwell points only to the terms

of the PSA, not to any conduct by the parties. Indeed, Maxwell alleges that Smithfield rebuffed all overtures—the opposite of an implied agreement to negotiate.

35. In short, the PSA does not impose a duty to negotiate in good faith to establish a substitute basis for determining Market Value. The Court therefore grants Smithfield's motion to dismiss the claim for breach of the duty to negotiate.

## C. Section 75-1.1

36. The last claim at issue is for violation of N.C.G.S. § 75-1.1. To state a claim, a plaintiff must allege that "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656 (2001). "The determination as to whether an act is unfair or deceptive is a question of law for the court." *Id.*

37. Maxwell asserts two theories: one that it calls a " 'direct' or 'pure' unfairness claim" based on Smithfield's alleged abuse of market power, (Opp'n 22, ECF No. 26; *see also* Am. Compl. ¶ 127), and another based on Smithfield's alleged breaches of the PSA, (*see* Am. Compl. ¶ 128). Smithfield argues that neither is unfair or deceptive within the meaning of the statute. (*See* Br. in Supp. 18–29.)

### 1. *Unfair Use of Market Power*

38. The premise of Maxwell's first theory is that Smithfield abused its "position in the market" to "creat[e] the conditions that made the hog business economically unsustainable for Maxwell." (Am. Compl. ¶ 126.) Thanks to "aggressive vertical integration" and "industry consolidation," Smithfield is the "dominant processor in the Southeast" and "substantially controls the market." (Am. Compl. ¶¶ 14, 37, 39,

44, 46, 50, 87, 88, 90, 93, 124, 127.) Possessing "monopoly buyer power," Smithfield has "manipulate[d] the Iowa-Southern Minnesota spot market" and "exert[ed] undue influence over the entire negotiated market." (Am. Compl. ¶¶ 46, 88, 125.) These actions drove down prices, putting severe "economic pressure" on Maxwell. (Am. Compl. ¶¶ 48, 51, 53, 88, 90, 124, 127.) Smithfield then used its leverage to force Maxwell out of business while giving better pricing to other suppliers, including its affiliates. (*See* Am. Compl. ¶¶ 46, 50, 51, 69, 80, 88, 90.)

39. Although Maxwell tries to deny it, there's no serious question that these are allegations of antitrust misconduct. A monopoly on the buyer side of a market— which is what Maxwell alleges—is known as a monopsony. In a monopsony, "the buyers have market power to decrease market demand for a product and thereby lower prices." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1315 (10th Cir. 2017) (quoting *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008)).[6] Actual and attempted monopsonies are prohibited both by state and federal antitrust laws. *See* N.C.G.S. § 75-2.1; 15 U.S.C. § 2.

40. It's also clear that Maxwell has not alleged all that is needed to state a valid monopsony claim. Without rebuttal, Smithfield showed that the amended complaint lacks essential elements, including the "possession of monopoly power in the relevant

---

[6] Monopoly claims usually involve allegations that a seller acquired market power so as to restrict output and raise prices. "[A] monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) (citation and quotation marks omitted); *see also Sykes*, 372 N.C. at 330 n.2 (describing a monopsony as "a market situation in which one buyer controls the market" (citation and quotation marks omitted)).

market" and the "willful acquisition or maintenance" of that power. *Sykes v. Health Network Sols., Inc.*, 2017 NCBC LEXIS 73, at \*60 (N.C. Super. Ct. Aug. 18, 2017) (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 710 (4th Cir. 1991)), *aff'd by an equally divided court*, 372 N.C. 326 (2019).

41. The upshot is that Maxwell's section 75-1.1 claim is based on antitrust allegations that fall short of an antitrust violation. According to Smithfield, that ends the matter, and the claim must be dismissed.

42. The Court agrees. When a plaintiff alleges monopolistic misconduct as the basis for overlapping antitrust and section 75-1.1 claims, "the failure of the antitrust claim also defeats liability under section 75-1.1." *SiteLink Software, LLC v. Red Nova Labs, Inc.*, 2016 NCBC LEXIS 45, at \*32 (N.C. Super. Ct. June 14, 2016); *see also, e.g.*, *Sykes*, 372 N.C. at 333 (affirming dismissal of section 75-1.1 claim premised on "the same conduct that is the subject of" deficient antitrust claims); *Sykes v. Blue Cross & Blue Shield of N.C.*, 2018 NCBC LEXIS 28, at \*31 (N.C. Super. Ct. Apr. 5, 2018) (dismissing section 75-1.1 claim based on deficient antitrust allegations), *aff'd*, 372 N.C. 318 (2019); *Drs. Making Housecalls-Internal Med., P.A. v. Onsite Care, PLLC*, 2019 NCBC LEXIS 6, at \*20 (N.C. Super. Ct. Jan. 16, 2019) (same); *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 396 (M.D.N.C. 2002) (same), *aff'd per curiam*, 67 F. App'x 810 (4th Cir. 2003).

43. It makes no difference that Maxwell chose not to pair its section 75-1.1 claim with a matching antitrust claim. What matters is the claim's substance, not its label. Chief Judge Bledsoe made this clear when he overruled Maxwell's opposition to

designation of this case to the Business Court. Maxwell argued at that time that it had not raised an issue of antitrust law because it had not asserted a claim under the antitrust statutes. Chief Judge Bledsoe disagreed, concluding that Maxwell "otherwise invoked state or federal antitrust law by alleging that Smithfield's monopolistic misconduct serves as the basis for its claim under section 75-1.1." *Maxwell Foods*, 2021 NCBC LEXIS 39, at *5–6 (citations and quotation marks omitted). As he put it, even without an independent antitrust claim, "there exists a material issue of antitrust law that *must be resolved* to litigate Maxwell's claim arising under section 75-1.1." *Id.* at *6 (emphasis added).

44. That issue can now be resolved on the pleadings. It is uncontested that Maxwell's allegations of monopolistic misconduct, even if taken as true, do not show a violation of the antitrust laws. Neither do they support liability under section 75-1.1.

45. Maxwell maintains that Smithfield's exploitation of market power, even if not monopolistic, amounts to "an inequitable assertion of its power or position" under section 75-1.1. (Opp'n 20 (quoting *Krebs v. Charlotte Sch. of L.*, 2017 U.S. Dist. LEXIS 143060, at *28 (W.D.N.C. Sept. 5, 2017)).) But North Carolina courts have rejected similar arguments based on the principle that, "[i]n the absence of conspiracy or monopoly, one may deal with whom he pleases." *Tel. Servs., Inc. v. Gen. Tel. Co. of the S.*, 92 N.C. App. 90, 93 (1988) (quoting *United Artists Records, Inc. v. E. Tape Corp.*, 19 N.C. App. 207, 214 (1973)), *review denied*, 324 N.C. 251 (1989).

46.    In *Telephone Services*, a telecommunications common carrier removed a contractor from its list of providers for installation and repair services.  This effectively eliminated the contractor from the market.  *See id.* at 91.  Seeking relief under section 75-1.1, the contractor alleged that the carrier had "monopoly status" and had "unfairly us[ed] its position of power" to force the contractor out of the market.  *Id.* at 93.  The Court of Appeals concluded that the allegations of monopoly power were inadequate and that, absent a monopoly, the carrier's exclusion of the contractor was not an unfair assertion of power.  *See id.* at 93–94.

47.    This Court followed suit in *Thompson Installations, Inc. v. Stock Building Supply, LLC*, 2012 NCBC LEXIS 12 (N.C. Super. Ct. Feb. 21, 2012).  That case involved an installation and supply contract.  Although the contract was nonexclusive, the defendant instructed the plaintiff not to perform installations for its competitors and threatened to terminate the contract if the plaintiff refused.  The plaintiff sued for breach of contract and unfair trade practices, alleging anticompetitive coercion but "no monopoly or attempted monopoly by Defendant." *Id.* at *12.  Relying on *Telephone Services*, this Court concluded that the defendant's actions were not unfair within the meaning of section 75-1.1 "regardless of [its] potentially anti-competitive intent." *Id.* at *14.

48.    To be clear, it is possible to plead and prove an inequitable assertion of position or power that is not based on an abuse of market or monopoly power. Plenty of cases have upheld section 75-1.1 liability when the circumstances involve fraud, wrongful retention of property, and abuse of overmatched consumers by well-heeled

institutions. *See, e.g., Nash Hosps., Inc. v. State Farm Mut. Auto. Ins. Co.*, 254 N.C. App. 726, 738 (2017) (involving insurer's conduct that "effectively deprived [the plaintiff] of the funds to which [it] was entitled by law"); *Faucette v. 6303 Carmel Road, LLC*, 242 N.C. App. 267, 276 (2015) ("Defendants abused their positions of power to withhold payment of the money [plaintiff] legally was owed, solely to pressure [plaintiff] to resolve several unrelated disputes . . . .").[7]

49.  This is not such a case. Maxwell accuses Smithfield of crafting a scheme to put it out of business, but the alleged scheme depends on the existence and misuse of monopoly power, not fraud or conversion of property. And these parties are large, sophisticated companies dealing at arms' length.

50.  Maxwell also suggests that Smithfield had all the power in the parties' relationship, making its conduct unfair. Again, though, the alleged source of Smithfield's power in its relationship with Maxwell is its monopoly power and control of the market. Without the monopoly allegations, Smithfield's actions are not unfair within the meaning of section 75-1.1. See Thompson, 2012 NCBC LEXIS 12, at *14. Maxwell has not cited any decision in which a court has upheld a section 75-1.1 claim based on an alleged imbalance of power between two sophisticated companies in an arms'-length contractual relationship even when the "economic fate" of one is tied to the other. Sara Lee Corp. v. Quality Mfg., Inc., 61 F. App'x 836, 839–40 (4th Cir.

---

[7] *See also, e.g., Moose v. Allegacy Fed. Credit Union*, 2021 NCBC LEXIS 47, at *11–13 (N.C. Super. Ct. May 5, 2021) (involving a consumer adhesion contract); *Hamm v. Blue Cross & Blue Shield of N.C.*, 2010 NCBC LEXIS 17, at *31 (N.C. Super. Ct. Aug. 27, 2010) ("Conduct by an insurance company that manifests an inequitable assertion of power or position also constitutes an unfair trade practice." (citation and quotation marks omitted)); *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68–73 (2000) (involving insurance carrier conduct).

2003) (concluding that party did not act unfairly or deceptively by imposing "onerous and one-sided" agreement on supplier, threatening to terminate exclusive relationship, and ending relationship in favor of performing supplier's duties in-house).

51. In sum, Maxwell has not adequately alleged monopolistic misconduct by Smithfield. Nor has it alleged any other basis to support its "direct" unfairness theory.

### 2. *Breach of Contract and Aggravating Circumstances*

52. As a second theory, Maxwell claims that Smithfield violated section 75-1.1 by breaching the PSA. Well-settled law holds otherwise.

53. Our appellate courts have stressed that "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 62 (1992); *see also, e.g.*, *SciGrip, Inc. v. Osae*, 373 N.C. 409, 427 (2020); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1988). Something more is needed. There must be "*egregious* or *aggravating* circumstances" coupled with the breach. *Dalton*, 353 N.C. at 657 (citations and quotation marks omitted); *see also* *SciGrip*, 373 N.C. at 426–27; *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88 (2013).

54. "As a general proposition, unfairness or 'deception either in the formation of the contract or in the circumstances of its breach' may establish the existence of substantial aggravating circumstances" under section 75-1.1. *SciGrip*, 373 N.C. at 426 (quoting *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989)). But "[i]t is far more difficult to allege and prove egregious circumstances *after* the

formation of the contract" because "disputes concerning the circumstances of the breach are often bound up with one party's exercise of perceived rights and remedies under the contract." *Post v. Avita Drugs, LLC*, 2017 NCBC LEXIS 95, at *10–11 (N.C. Super. Ct. Oct. 11, 2017). These claims are "best resolved by simply determining whether the parties properly fulfilled their contractual duties." *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 245 N.C. App. 378, 383 (2016) (citation and quotation marks omitted).

55. "Only where the circumstances of the breach exhibit clear deception are they sufficiently egregious to impose section 75-1.1 liability." *Post*, 2017 NCBC LEXIS 95, at *11. This might include, for example, "the concealment of a breach combined with acts to deter further investigation." *Id.* at *12 (citation and quotation marks omitted). A simple failure to disclose a breach, on the other hand, is not enough. *See Heron Bay*, 245 N.C. App. at 383 n.1; *see also Post*, 2017 NCBC LEXIS 95, at *11 ("A party's threats to terminate, efforts to encourage another to continue contractual performance while planning to breach, and refusal to otherwise meet contractual obligations do not rise to the level of aggravating circumstances." (citations and quotation marks omitted)).

56. Maxwell's allegations do not stack up. Its claim for breach of the duty to negotiate has been dismissed. And it has not pointed to deception or other egregious circumstances related to the alleged breach of the output provision. (*See generally* Opp'n 26–28.)

57. As for the most-favored-nation clause, Maxwell argues that "Smithfield had a duty to inform Maxwell of other economic benefits" given to major swine suppliers and that Smithfield hid that information to conceal its breach. (Opp'n 27.) It's not clear what Maxwell means by a duty to inform because the PSA does not expressly impose any duty on Smithfield to disclose information to Maxwell about other suppliers. In any event, whether Smithfield had an express or implied duty to inform Maxwell and whether it complied with such a duty are simply contract questions, turning on the scope of each side's rights and obligations under the PSA.

58. More broadly, Maxwell has not alleged that Smithfield concealed its breach or took steps to deter investigation. What the amended complaint alleges is that Smithfield voluntarily began sharing production and sales information with its suppliers, including Maxwell, in 1994 and then stopped some twenty years later. (*See* Am. Compl. ¶¶ 54, 55.) At no point does the amended complaint allege that Smithfield provided false or misleading information, that it took affirmative steps to conceal or destroy information, or that Maxwell was prevented from making inquiries to police compliance with the most-favored-nation clause. Likewise, Smithfield "has not denied" that it gave other suppliers better terms, even when confronted by Maxwell. (Am. Compl. ¶ 85.) At most, these allegations show that Smithfield failed to disclose its breach, which is not sufficiently deceptive or egregious to support liability under section 75-1.1. *See Heron Bay*, 245 N.C. App. at 383 n.1; *see also United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981) (holding that no "unfairness inhered in the circumstances of the breach within the

meaning of the statute simply because the breach was intentional and not promptly disclosed").

59. Maxwell offers little else. It contends that Smithfield "intentionally deprived Maxwell of the benefit of the" most-favored-nation clause. (Opp'n 27.) Even assuming that Smithfield acted with ill will and with knowledge of how severe the harm would be to Maxwell, that's just another way of saying that Smithfield intentionally breached the PSA. *See, e.g.*, *Haddock v. Volunteers of Am., Inc.*, 2021 NCBC LEXIS 70, at \*28–29 (N.C. Super. Ct. Aug. 25, 2021); *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at \*21–23 (N.C. Super. Ct. Mar. 27, 2017); *Flanders/Precisionaire Corp. v. Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n*, 2015 NCBC LEXIS 36, at \*38 (N.C. Super. Ct. Apr. 7, 2015); *see also CF Indus., Inc. v. Transcon. Gas Pipe Line Corp.*, 448 F. Supp. 475, 485 (W.D.N.C. 1978) ("It can hardly be doubted that most, if not all, . . . buyers who refuse delivery in a falling market do so intentionally, yet these ordinary commercial breaches are wholly foreign to the purposes of § 75-1.1.").

60. This is not "the unusual case in which the circumstances of the breach itself are egregious and deceptive." *Post*, 2017 NCBC LEXIS 95, at \*13. The PSA's "terms—and not section 75-1.1—define the parties' rights and obligations, as well as the remedies for the alleged breaches." *Id.* at \*16.

\*    \*    \*

61. Neither of Maxwell's theories states a claim for relief under section 75-1.1. The Court therefore grants Smithfield's motion to dismiss the claim.

IV.
CONCLUSION

62.    For all these reasons, the Court **GRANTS in part** and **DENIES in part** Smithfield's partial motion to dismiss and **ORDERS** as follows:

a. The Court **GRANTS** the motion to dismiss Maxwell's second claim for breach of the duty to negotiate.  The claim is dismissed with prejudice.

b. The Court **GRANTS** the motion to dismiss Maxwell's fourth claim for violation of N.C.G.S. § 75-1.1.  In its discretion, the Court dismisses the claim without prejudice.

c. In all other respects, the Court **DENIES** the motion.

**SO ORDERED**, this the 26th day of August, 2021.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases